**Opinion issued June 12, 2014.**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-13-00165-CV

————————————

**CERTAIN UNDERWRITERS AT LLOYD'S OF LONDON SUBSCRIBING TO POLICY NUMBER: FINFR0901509, Appellants**

**V.**

**CARDTRONICS, INC., Appellee**

---

**On Appeal from the 334th District Court**
**Harris County, Texas**
**Trial Court Case No. 2011-68592**

---

**OPINION ON REHEARING[1]**

This is a permissive interlocutory appeal of a partial summary judgment. *See*

TEX. CIV. PRAC. & REM. CODE ANN. § 51.014(d) (West Supp. 2013). Certain

---

[1] Underwriters have moved for reconsideration of our March 11, 2014 opinion. The panel denies rehearing, withdraws its prior opinion and judgment, and issues this opinion and judgment in their place.

Underwriters at Lloyd's of London Subscribing to Policy Number FINFR0901509 appeal the trial court's determination that Underwriters' insured, Cardtronics, Inc., suffered a covered loss under the policy that had to be paid without Cardtronics first exhausting its claims against responsible third parties. We affirm.

## Background

This commercial insurance coverage dispute arises out of a theft of over $16 million from Cardtronics, which owns and operates automated teller machines (ATMs). The theft was committed by the former president of Mount Vernon Money Center (Mount Vernon), an armored car company. Under an "Armored Carrier Agreement," Cardtronics leased currency from Bank of America, N.A. (BOA), and made the currency available to Mount Vernon. Pursuant to an "ATM Management Service Agreement" between Mount Vernon and Cardtronics, Mount Vernon provided cash replenishment services to Cardtronics's ATMs. Mount Vernon was charged with picking up the currency from BOA, storing it in its vaults, and transporting it as needed to ATMs owned and operated by Cardtronics.

An insurance policy styled as "Automated Teller Machine and Contingent Cash in Transit" insurance provided that Underwriters "will pay for loss of 'money' and 'securities' outside the 'premises' in the care and custody of a 'messenger' or an armored motor vehicle company resulting directly from 'theft,' disappearance or destruction." The policy also covers additional risks, such as the

risks of employee theft, forgery or alteration of checks and other instruments, theft of money from Cardtronics's premises, safe robberies, computer fraud, funds transfer fraud, fraudulent money orders, and counterfeit paper currency. The policy does not expressly require Cardtronics to carry any other insurance policies. The policy is appended to a "Cover Note" sent to Cardtronics and signed by Lockton Companies International Limited, stating that coverage had been effected with Underwriters.

Unlike the other risks covered by the policy, subparagraph E.4.A, captioned "Armored Motor Vehicle Companies," provides that Underwriters would only pay for the amount of loss for contingent cash in transit that Cardtronics "cannot recover" under its agreement with an armored motor vehicle company or under any insurance carried either by that company or on behalf of its customers.

In early 2010, Mount Vernon's president was arrested for conspiracy to commit bank fraud; he was later charged with bank fraud and conspiracy to commit bank and wire fraud. Upon discovery of the theft, Cardtronics quickly notified Underwriters of its loss. Within days, the Federal Bureau of Investigation seized over $19 million from two Mount Vernon locations, and a receiver was appointed to oversee Mount Vernon's operations. The receiver filed a report showing that almost $50 million belonging to Mount Vernon's customers was missing from either Mount Vernon's vaults or its customers' ATMs. In May,

Mount Vernon commenced Chapter 11 bankruptcy proceedings in the United States Bankruptcy Court for the Southern District of New York.

In June, Cardtronics timely tendered proof of loss to Underwriters for over $16 million and requested payment. The policy required Underwriters to accept or reject Cardtronics's claim within 15 days after receiving proof of loss. If Underwriters were unable to accept or reject the claim within that period, the policy permitted Underwriters to notify Cardtronics within that same period that Underwriters needed additional time to reach a decision. In such event, Underwriters would then be obligated to accept or to reject the claim within 45 days of that notice and, if the claim were accepted, make any payment of the claim within 5 business days after acceptance.

Underwriters did not accept or reject the claim; it instead repeatedly extended the deadline for submitting a proof of loss. Nearly one year after Cardtronics's first request for payment, Underwriters notified Cardtronics in writing that it would not pay the claim until the completion of proceedings against Mount Vernon and its insurance carriers so that "any shortfall in recovery" could be "conclusively determined." A few months later, Underwriters denied coverage.

While Cardtronics pursued recovery from Underwriters, it also sought recovery of the funds seized by the FBI and from Mount Vernon. Cardtronics filed a proof of claim in Mount Vernon's bankruptcy case. The bankruptcy trustee sued

Mount Vernon's carrier to recover the losses sustained by Mount Vernon's defrauded clients, but the carriers denied coverage; that claim is currently pending. More than two years after it discovered its loss, Cardtronics recovered almost $3 million from the funds seized by the FBI. In the interim, Cardtronics was forced to take out a loan to repay the leased money it owed to BOA.

A few months before the date it was contractually required to file suit, Cardtronics sued Underwriters under its insurance policy for breach of the policy, breach of the Texas Insurance Code, breach of the Prompt Payment Act, and breach of the duty of good faith and fair dealing. The parties filed cross-motions for summary judgment on the breach of contract claims. Cardtronics argued that it could not recover its loss from Mount Vernon or its carriers before the deadline for submitting its proof of loss or before the two-year deadline for filing suit and, therefore, it would be irreconcilable with these time limits to interpret the policy as requiring Cardtronics to exhaust its remedies against third parties before filing a claim. Underwriters argued that the applicable policy provision was contingent in nature and contractually obligated Cardtronics to seek reimbursement from and exhaust all remedies against potentially responsible third parties before Underwriters would become obligated to pay for the covered loss.

The trial court granted Cardtronics's motion, ruling that Cardtronics suffered a covered loss under the policy and that the policy did not require Cardtronics to

exhaust all of its remedies. Subsequently the trial court determined that its summary judgment order involved controlling questions of law as to which there was a substantial ground for difference of opinion and that an immediate appeal of the order may materially advance the ultimate termination of the litigation. The trial court therefore granted permission to file a request for a permissive interlocutory appeal pursuant to Texas Rule of Civil Procedure 168 and section 51.014(d) of the Texas Civil Practice and Remedies Code.

After the trial court's ruling, Underwriters paid Cardtronics $13,348,826.69, representing the $16,177,510 in cash stolen by the armored car company less the $5000 deductible and the $2,823,683.31 distribution received by Cardtronics from the FBI–seized cash. However, Cardtronics states that this payment does not account for its accrued pre-judgment interest, other items claimed in its proof of loss, or additional damages, including lost borrowing costs. Pursuant to Underwriters' subrogation rights under the policy, Underwriters requested that Cardtronics transfer to them "all [of its] rights of recovery against any person or organization for any loss [it] sustained and for which [Underwriters] have paid or settled." Cardtronics complied.

On appeal, Underwriters present three issues: (1) whether any payment is currently due from Underwriters to Cardtronics, (2) whether "the time limitations for proof of loss and suit in the Cardtronics policy override the express provisions

requiring Cardtronics to exhaust its remedies against specified third parties," and (3) whether "there [is] inherent inconsistency between the provision granting Underwriters subrogation rights and the provision requiring Cardtronics to exhaust its remedies against specified third parties."

## Jurisdiction

As permitted by the trial court's Rule 168 order, Underwriters filed a petition for permissive interlocutory appeal pursuant to Section 51.014(f) of the Texas Civil Practice and Remedies Code. We granted the petition because the proper interpretation of the policy is a controlling issue of law as to which there is a substantial ground for difference of opinion, and the remaining issues in the case after the partial summary judgment depend upon the ultimate resolution of this issue. For example, Cardtronics's claims for extra-contractual and penalty damages based on insurance bad faith and untimely payment are tied to the interpretation of the policy.

## Standard of Review

Our review of a summary judgment is de novo. *Tex. Mun. Power Agency v. Pub. Util. Comm'n of Tex.*, 253 S.W.3d 184, 192 (Tex. 2008); *City of Galveston v. Tex. Gen. Land Office*, 196 S.W.3d 218, 221 (Tex. App.—Houston [1st Dist.] 2006, pet. denied). Under the traditional summary judgment standard, the movant must show that no genuine issue of material fact exists and that judgment should

be rendered as a matter of law. TEX. R. CIV. P. 166a(c); *City of Galveston*, 196 S.W.3d at 221. Summary judgment for Cardtronics, as the plaintiff, was proper if Cardtronics conclusively established each element of its cause of action. "We view all evidence in a light most favorable to the nonmovant and indulge every reasonable inference in the nonmovant's favor." *City of Galveston*, 196 S.W.3d at 221.

Because the trial court's judgment and order do not specify the grounds on which it granted summary judgment on Cardtronics's breach of policy claim, Underwriters must demonstrate that none of the proposed grounds are sufficient to support the judgment. *See Rogers v. Ricane Enters.*, 772 S.W.2d 76, 79 (Tex. 1989); *West v. SMG*, 318 S.W.3d 430, 437 (Tex. App.—Houston [1st Dist.] 2010, no pet.). Conversely, we will affirm the judgment if any of the theories advanced in the summary judgment motion is meritorious. *Joe v. Two Thirty Nine Joint Venture*, 145 S.W.3d 150, 157 (Tex. 2004); *West*, 318 S.W.3d at 437.

## The policy does not require exhaustion

### A.    The legal issue

The legal issue in this case is whether the terms of the insurance policy require the insured or the insurer to bear the loss caused by inevitable delays that occur when a potentially liable third party does not accept responsibility for a loss suffered by the insured and covered by its policy, as well as the costs and risks of

pursuing such claims. Cardtronics contends that Underwriters must bear that loss because Cardtronics could not recover from any potentially responsible third parties before the contractually-imposed deadline for submitting its sworn proof of loss to Underwriters. Underwriters contend that they may unilaterally extend the deadline for submitting the proof of loss and thereby extend their time for accepting or denying coverage, until the disputes with all such third parties are "concluded."[2]

Underwriters denied coverage based on subparagraph E.4.A of the policy, which provides that Underwriters will only pay "the amount of loss [Cardtronics] cannot recover" from Mount Vernon or its insurers. Underwriters contend that this provision "clearly" requires Cardtronics to exhaust its remedies against those specified third parties before Underwriters are required to pay any covered loss. The parties agree that the Texas appellate courts have not addressed the "cannot recover" language in the policy.

---

[2] Underwriters do not challenge the trial court's determination that Cardtronics suffered a loss as provided in Underwriters' policy. Nor do they challenge the following undisputed facts implicit in this determination: Cardtronics learned of its loss during the policy coverage period; Cardtronics gave Underwriters timely notice and proof of loss; Underwriters ultimately denied Cardtronics's claim; Cardtronics filed suit against Underwriters within two years of discovering its loss; although Cardtronics demanded that MVMC and its insurers pay the loss, Cardtronics did not recover its loss from them, or any other third party, before the deadline for submitting its proof of loss or before the two-year deadline for filing suit; and Cardtronics did not recover the approximately $3 million from the FBI until after the two-year litigation deadline had expired.

Cardtronics responds that the policy "contains no *express* requirement that the policyholder exhaust every effort to recover from these third parties. *Implying* such a requirement contradicts other policy terms and violates basic rules of contract construction." Cardtronics also relies on policy terms that impose certain time limits for various actions the policyholder must take. First, the policyholder must file a claim with a detailed sworn proof of loss within 120 days after the insured learns of the loss; Underwriters must accept or deny that claim within 15 days thereafter (or an additional 45 days if requested). Second, the policyholder is required to file suit within two years of the discovery of its loss, here by February 2012. Cardtronics also relies on the policy provision granting Underwriters subrogation rights against "any person or organization for any loss you sustained and for which we have paid or settled" if the insurer has to pay a loss. This provision requires Cardtronics to transfer to Underwriters all such rights of recovery.

Both parties thus contend that the policy language is unambiguous and supports their respective positions, or alternatively that the policy is ambiguous and nonetheless must be construed in support of their respective positions.[3]

---

[3] Underwriters argue in their motion for rehearing that the procedural posture of the case prevents us from determining that relevant portions of the policy are unambiguous. Specifically, they argue that in order to grant their petition to pursue this interlocutory appeal, we determined that there is "substantial ground for difference of opinion" and that this determination is incompatible with a holding

**B.**     **The plain language rule governs insurance policies**

Texas courts interpret insurance policies according to the rules of contract interpretation. *See State Farm Lloyds v. Page*, 315 S.W.3d 525, 527 (Tex. 2010); *Kelley-Coppedge, Inc. v. Highlands Ins. Co.*, 980 S.W.2d 462, 464 (Tex. 1998). A court's primary goal is to determine the contracting parties' intent as expressed by the policy's written language interpreted through the application of established rules of contract interpretation. *See Page*, 315 S.W.3d at 527; *SA-OMAX 2007, L.P. v. Certain Underwriters at Lloyd's, London*, 374 S.W.3d 594, 598 (Tex. App.—Dallas 2012, no pet.) ("If the insurance contract can be given an exact or

---

that only one reasonable interpretation of the disputed portions of the policy exists. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 51.014(d)(1) (interlocutory appeal permitted when "the order to be appealed involves a controlling question of law as to which there is a substantial ground for difference of opinion"). We disagree.

Both parties argued in their opening briefs—and Underwriters argued in their petition for interlocutory review—that the policy was unambiguous, despite the parties' disagreement as to how to interpret it in the absence of controlling law. Indeed, there may be ground for disagreement as to what effect the law gives to a document, despite internal clarity as to what the document actually says. Thus, Texas courts considering such interlocutory appeals have nonetheless been able to hold that the contracts in question are unambiguous. *E.g.*, *Houston Exploration Co. v. Wellington Underwriting Agencies, Ltd.*, 352 S.W.3d 462, 468, 472–73 (Tex. 2011) (affirming decision in which court of appeals granted permissive interlocutory appeal and in which both Supreme Court and court of appeals held that contract was unambiguous); *see also Lyle v. Jane Guinn Revocable Trust*, 365 S.W.3d 341, 345, 349–53 (Tex. App.—Houston [1st Dist.] 2010, pet. denied) (holding contract unambiguous on interlocutory appeal); *Truck Ins. Exch. v. Chalfant*, 192 S.W.3d 813, 814, 816–18 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (analyzing contract for ambiguity on interlocutory appeal). The procedural posture of the case does not mandate that we hold that the contract is ambiguous.

certain legal interpretation, then it is not ambiguous, and we must interpret the insurance policy's meaning and intent from its four corners.").

Whether a particular provision or the interaction between provisions creates an ambiguity is a question of law. *Page*, 315 S.W.3d at 527. The court decides whether an ambiguity exists by looking at the contract as a whole in light of the circumstances present when the contract was entered into and by applying proper canons of construction. *See id.*; *Kelley-Coppedge,* 980 S.W.2d at 464–65. "[C]ourts must be particularly wary of isolating from its surroundings or considering apart from other provisions a single phrase, sentence, or section of a contract." *State Farm Life Ins. Co. v. Beaston*, 907 S.W.2d 430, 433 (Tex. 1995). By examining all parts of the policy together, courts strive to give meaning to the entire policy without rendering any provision meaningless surplusage. *See SA-OMAX*, 374 S.W.3d at 598. Courts "construe contracts 'from a utilitarian standpoint bearing in mind the particular business activity sought to be served' and 'will avoid when possible and proper a construction which is unreasonable, inequitable, and oppressive.'" *Frost Nat'l Bank v. L&F Distribs., Ltd.*, 165 S.W.3d 310, 312 (Tex. 2005) (per curiam) (quoting *Reilly v. Rangers Mgmt., Inc.*, 727 S.W.2d 527, 530 (Tex. 1987)).

Only if the policy is subject to two or more reasonable interpretations after application of these canons of construction is it considered ambiguous. *Page*, 315

S.W.3d at 527; *Beaston*, 907 S.W.2d at 433. If there is only one reasonable interpretation, the policy language is not ambiguous and the court is obligated to interpret the contract as a matter of law. *DeWitt Cnty. Elec. Coop., Inc. v. Parks*, 1 S.W.3d 96, 100 (Tex. 1999). If the policy is unambiguous, parol evidence is inadmissible to vary the terms of the contract. "The parties' intent is governed by what they said in the insurance contract, not by what one side or the other alleges they intended to say but did not." *Gilbert Tex. Constr., L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118, 127 (Tex. 2010) (citing *Fortis Benefits v. Cantu*, 234 S.W.3d 642, 647, 649 (Tex. 2007)).

When a policy is ambiguous, however, Texas courts generally apply the canon of interpretation that courts should "construe [the policy's] language against the insurer in a manner that favors coverage." *Beaston*, 907 S.W.2d at 433; *see also TIG Ins. Co. v. N. Am. Van Lines, Inc.*, 170 S.W.3d 264, 268 (Tex. App.—Dallas 2005, no pet.); *see generally Fiess v. State Farm Lloyds*, 202 S.W.3d 744, 746 (Tex. 2006) (applying rule to exclusion). This rule is applied as a tiebreaker when none of the other canons supply the policy's meaning. *See* 11 Richard A. Lord, Williston on Contracts § 32.12 (4th ed. 2011) ("The rule of *contra proferentem* is generally said to be a rule of last resort and is applied only where other secondary rules of interpretation have failed to elucidate the contract's meaning."); 2 Steven Plitt, Daniel Maldonado, Joshua D. Rogers, & Jordan R. Plitt,

Couch on Ins. § 22.16 (3d ed. 2011) (noting that rule of construction of ambiguous policy against insurer is one of last resort). On the other hand, the normal canons of interpretation—which apply to the interpretation of insurance policies—also provide that an ambiguous contract is generally construed against its drafter. *Temple-Eastex, Inc. v. Addison Bank*, 672 S.W.2d 793, 798 (Tex. 1984); *see also Balandran v. Safeco Ins. Co. of Am.*, 972 S.W.2d 738, 741 n.1 (Tex. 1998) (explaining *contra proferentem* as outgrowth of general rule of construction against document's drafter).

### 1.    The policy term relied upon by Underwriters

Underwriters rely on Paragraph E.4 of the policy, entitled "Conditions Applicable to Insuring Agreements A.4. and A.5.", Subparagraph E.4.A, entitled "Armored Motor Vehicle Companies," provides in relevant part as follows:

> Under Insuring Agreement A.5., we will only pay for the amount of loss you cannot recover:
> (1) Under your contract with the armored motor vehicle company; and
> (2) From any Insurance or indemnity carried by, or for the benefit of customers of, the armored motor vehicle company.

Cardtronics observes that the policy does not expressly require it, as the policyholder, to exhaust its remedies against third parties and contends that the policy as a whole negates such an obligation. Under Cardtronics's construction, Underwriters are obligated to "only pay for the amount of the loss [Cardtronics] cannot recover" by the policy-imposed deadline for filing claims. It is undisputed

14

that Cardtronics was unable to recover any funds from any third party before filing its claim with Underwriters.

Underwriters argue that construing the policy to require payment before exhaustion ignores the plain meaning of "cannot recover," rendering subparagraph E.4.A meaningless and reducing the incentives for Cardtronics to pursue its remedies. Underwriters contend that "cannot recover" must refer to the ultimate amount of loss suffered by Cardtronics after all efforts to recover against third parties have been exhausted. By this reasoning, Underwriters have the unilateral— although not expressly stated—right to extend the policy time limits until such efforts are exhausted, and thus there are no contradictions in the policy's terms.

The contract policy does not actually contain the word "exhaust" or any derivative thereof, although the parties agree that it could have been drafted to contain such an explicit requirement.[4] Moreover, the policy's claim and response deadlines run from the time of loss, which Underwriters concede means the time of the theft, not from the time claims against the motor carrier and its insurers are "conclusively determined."

---

[4] Underwriters concede that the following language would have been clearer: "Notwithstanding any other provision of this insurance policy, [Cardtronics] must exhaust [its] remedies against any armored vehicle company and its insurers before we [Underwriters] will pay a claim." Such drafting could have unambiguously given the policy the meaning urged by Underwriters.

**2.  The cases cited by Underwriters are distinguishable**

Because no Texas appellate court has addressed the policy language at issue, Underwriters rely upon two federal decisions. Underwrites contend that these cases stand for the proposition that when an insurance policy provides coverage that is contingent on the insured not being able to recover from other parties, it is insufficient for the insured to show that the other parties have refused to pay, and the insured must instead exhaust judicial remedies against those parties. Because the claims against Mount Vernon and its insurers are ongoing, how much Cardtronics "cannot recover" from these sources is unresolved. And in the absence of proof of how much Cardtronics "cannot recover," Underwriters contend that Cardtronics cannot establish that it has suffered a quantifiable, payable loss; therefore, its claims against Underwriters are premature. First, Underwriters rely on *Sherwin-Williams Co. v. Insurance Co. of Pennsylvania*, 105 F.3d 258 (6th Cir. 1997). Second, Underwriters cite to *Manpower, Inc. v. Insurance Co. of Pennsylvania*, 807 F. Supp. 2d 806 (E.D. Wis. 2011). These cases are distinguishable.

*a.  Sherwin-Williams*

In *Sherwin-Williams*, the United States Court of Appeals for the Sixth Circuit considered a "difference in conditions" (DIC) policy issued by the Insurance Company of the State of Pennsylvania. 105 F.3d at 259. That policy

16

explicitly contemplated that the insured would maintain separate primary coverage. *Id.* The policy "provide[d] coverage only to the extent that a loss [was] not covered by or exceed[ed] the limits of the *primary* insurance," and it provided that the insurer "shall be liable for loss or damage only to the extent of that amount in *excess* of the amount recoverable from such other insurance." *Id.* at 259 & n.2 (emphasis added). Thus, the policy generally applied only as excess coverage, and only applied "as primary insurance when a peril [therein] is *not insured* under a specific primary policy." *Id.* at 261.

The *Sherwin-Williams* court was required to determine the meaning of the policy's "not insured" language under Ohio law. *Id.* at 261–62. The court explained the differences between primary insurance, which is generally available immediately upon the insured's experience of loss, and excess coverage, which is only available after the insured has exhausted primary coverage. *Id.* at 262. Applying this principle, the Sixth Circuit found nothing in the policy language "which purports to protect the insured against variations in the insurance coverage available from other insurance carriers . . . ." *Id.* at 263 (internal quotation marks omitted). The court also found that, even if Sherwin-Williams had brought suit prematurely, it had already preserved its rights under the policy in question by filing proofs of claim and suing primary carriers for relief. *Id.* Considering all of these factors, the court held that Sherwin-Williams was required to exhaust its

primary coverage before recovering under its excess policy with ISOP. *Id.* at 264. The court made clear, however, that Sherwin-Williams would be permitted to show on remand that it already had exhausted its primary coverage. *Id.*

### b. *Manpower*

In *Manpower*, the Eastern District of Wisconsin considered another "difference in conditions" policy containing essentially the same "not insured" term as the policy construed in *Sherwin-Williams*. 807 F. Supp. 2d at 806–07. As in *Sherwin-Williams*, the insured sought coverage up to the policy's limits. *Id.* at 807. The insurer responded, citing *Sherwin-Williams*, that the insured could not establish a right to payment until it had exhausted coverage under a French primary policy and the scope of the primary policy had been determined by a French court. *Id.* at 807–08. Manpower countered that it had established a difference in conditions as soon as the primary insurer closed its file and the difference-in-conditions insurer began making payments. *Id.* at 808.

The district court determined that neither party's position was supported by the contract. *Id.* The court held that "nothing in the DIC policy states that Manpower must exhaust coverage under the local policy by taking legal action," but "[a]ll that Manpower must do is show that the DIC policy is broader" than the local policy, which could be accomplished either through litigation in France or by

presenting both policies to the district court. *Id.* The district court distinguished *Sherwin-Williams*—the only case discussed in the opinion—as follows:

> But *Sherwin–Williams* does not hold that a policyholder must bring legal proceedings against a primary insurer before seeking coverage under a DIC policy. *It holds only that the policyholder must establish that the amount of coverage available under the primary policy is less than the amount available under the DIC policy*, and that a "mere denial of coverage" by the primary insurer does not automatically establish that coverage under the primary policy is unavailable.

*Id.* at 808 n.5 (emphasis added and citation omitted).

### c.  *Sherwin-Williams* and *Manpower* are distinguishable

These cases do not apply to the dispute between Cardtronics and Underwriters. Most importantly, both *Sherwin-Williams* and *Manpower* construed *excess* policies, not primary policies. Both *Sherwin-Williams* and *Manpower* address the extent to which an insured must pursue a recovery from a primary insurer or demonstrate that no primary coverage is available before seeking recovery from an excess insurer. *Sherwin-Williams*, 105 F.3d at 259; *Manpower*, 807 F. Supp. 2d at 806.

Underwriters insist that the policies in those cases were not excess policies, but merely "difference in conditions" policies. Under such a policy, coverage may "drop down" to cover the entire loss if no primary coverage applies to the loss. Underwriters argue that such policies are analogous to the policy issued to Cardtronics. According to Underwriters, these cases therefore stand for the

19

principle that exhaustion should be required whenever coverage under an insurance policy is conditioned on the insured's inability to recover from specifically named or described third parties. Contrary to Underwriters' interpretation, both *Sherwin-Williams* and *Manpower* analyze the policies in question as being excess policies in essence, if not in name. Underwriters make no effort to demonstrate that the principles requiring exhaustion of primary insurance before recovering from an *excess* carrier are applicable to recovery from non-insurer third parties before recovery from a *primary* carrier.

The policy held by Cardtronics is not an excess or "difference in conditions" policy, but is the primary insurance held by Cardtronics for the covered types of losses. It does not require Cardtronics to carry any additional coverage for losses incurred in connection with an armored car company. Nor does it require Cardtronics to mandate that its motor carriers are insured. The relationship between a primary insurer and its insured is fundamentally different from other types of relationships potentially involving a recovery for loss, such as between Cardtronics and Mount Vernon or the Mount Vernon Trust. Underwriters argue that the Cardtronics policy is explicitly "contingent" on inability to recover from certain other sources. But the policy does not contain such an express requirement. Further, all insurance is contingent, explicitly or implicitly, on the insured's experience of an actual loss that cannot be recovered immediately. If Cardtronics

had recovered the stolen money and incurred no other losses before filing a proof of claim, then Cardtronics would not be entitled to a recovery from Underwriters. But those are not the facts before us, and there is nothing in the policy language that requires Cardtronics to exhaust every possibility of recovery to establish that it "cannot recover" under its contract with Mount Vernon or through any insurance policies purchased by Mount Vernon.

Further, both *Sherwin-Williams* and *Manpower* are based on policy conditions providing that coverage was available only for amounts "not insured" by other policies. *Sherwin-Williams*, 105 F.3d at 261; *Manpower*, 807 F. Supp. 2d at 807. The policy before us, on the other hand, states merely that Underwriters "will only pay for the amount of loss [Cardtronics] cannot recover" from certain third parties. These are different conditions, and there is no reason to treat them as imposing essentially the same burdens on the insured parties.

Thus, *Sherwin-Williams* and *Manpower* are not persuasive authority, given that they each construed a different type of policy with different language.

### 3. The policy required Cardtronics to pursue its claims against Underwriters

The policy does not explicitly require Cardtronics to exhaust its remedies against third parties before bringing suit against Underwriters. On the contrary, it requires Cardtronics to bring only one suit: suit against Underwriters must be "brought within 2 years from the date [Cardtronics] discover[ed] the loss."

Although the policy does not define "loss," it defines "discovery of loss" as occurring "when [Cardtronics] *first* become[s] aware of facts which would *cause a reasonable person to assume* that a loss covered by this policy has been or will be incurred, *even though the exact amount or details of loss may not then be known.*" (emphasis added). The indictment and arrest of Mount Vernon's former president for theft of client funds, including funds entrusted to Mount Vernon by Cardtronics, constituted a discovery of loss because any reasonable person would believe that a loss covered by the policy had been or would be incurred. By the policy's plain terms, Cardtronics was required to submit a proof of loss within 120 days of learning of the facts underlying that arrest. The policy then required Underwriters to accept or reject the claim within 45 days and pay it within five days of that decision. When Underwriters failed to do so, Cardtronics was obligated to bring suit within two years of learning of the facts leading to the arrest, if it was unable to recover its loss before that time. It is undisputed that Cardtronics was obligated to take reasonable steps to secure Underwriters' rights of recovery from third parties before filing a proof of claim. It is also undisputed that Cardtronics did so, yet was unable to recover its loss before submitting its claim or bringing suit.

Underwriters' alternative interpretation, that the policy's coverage will not be triggered until the amount of the loss is conclusively determined, is not

reasonable. Such an interpretation would require us to "isolat[e] from its surroundings or consider[] apart from other provisions a single phrase, sentence, or section of a contract," namely subparagraph E.4.A. *Beaston*, 907 S.W.2d at 433. In other words, because the policy is silent as to a deadline for when Cardtronics must demonstrate what it "cannot recover" before payment from Underwriters is triggered, the "conclusive determination" language urged by Underwriters' interpretation is unduly restrictive and too stringent a test. In any event, an explicit statement of such a requirement is wholly absent from the policy. The policy could easily have imposed such a condition explicitly. Indeed, certain types of losses not relevant here are only recoverable under the policy after "final adjudication" of certain claims. There is no reason to add to the plain language of the policy the restrictions which Underwriters seek to place on the "cannot recover" language.

### a. The policy's use of the word "contingent"

Underwriters argue that the policy's use of the word "contingent" mandates the interpretation that Underwriters' liability under the policy is contingent on the ultimate inability of Cardtronics to recover some amount of its loss. As support, Underwriters point to the cover note's description of the policy as "Automated Teller Machine and *Contingent* Cash in Transit insurance." (emphasis added, capitalization original). According to Underwriters, "contingent" in this context modifies "insurance," that is, the nature of the policy itself. Underwriters argue that

23

Cardtronics therefore has not suffered a compensable loss "until it can be conclusively determined how much Cardtronics cannot recover from [Mount Vernon] or the [Mount Vernon] Insurers." We reject this interpretation for four reasons.

First, Underwriters' interpretation ignores the fact that the cover note itself identifies a "Sum Insured" for "Contingent Cash in Transit," namely "USD 25,000,000 any one accident or occurrence." It also refers to "Lockton International ATM & Contingent Cash in Transit wording (USA)." The word "insurance" does not appear in either of these contexts. These uses indicate that "contingent" modifies "cash in transit" in the phrase "Automated Teller Machine and Contingent Cash in Transit insurance," and not "insurance."[5]

Second, the phrase "contingent cash in transit" appears only in the first two pages of declarations; it does not appear in the "insuring agreements" in Section A of the policy, in the limitations or exclusions, or anywhere else. The policy does not define "contingent," "contingent cash," "contingent cash in transit," or "Contingent Cash in Transit insurance." These facts counsel against reading the cover note's identification of the policy's type as "Automated Teller Machine and

---

[5] In their motion for rehearing, Underwriters suggest that we have taken judicial notice of sources outside the four corners of the policy in concluding that "contingent" can modify "cash in transit." However, we base our analysis entirely on the document's own terms.

Contingent Cash in Transit insurance" as creating a substantive obligation on Cardtronics to exhaust its remedies before bringing a claim.[6]

Third, as we have already observed, all insurance is contingent on the occurrence of some event. It would render the word "contingent" effectively meaningless to read it as merely standing for the fact that coverage is contingent on the occurrence of a covered event and satisfaction of the policy's terms. We must prefer interpretations that give all provisions of the contract meaning. *See SA-OMAX*, 374 S.W.3d at 598. We therefore will not construe "contingent" as having no meaning, nor will we attribute to this lone word such a sweeping meaning as to impose a substantive obligation on Cardtronics to exhaust its remedies.

Fourth, the "last antecedent" doctrine, while it "is neither controlling nor inflexible," compels us to read "contingent" as modifying "cash in transit" here. *E.g.*, *Spradlin v. Jim Walter Homes, Inc.*, 34 S.W.3d 578, 580–81 (Tex. 2000) (explaining "last antecedent" doctrine as applied to statutory texts and

---

[6] On rehearing, Underwriters argue that our holding will have sweeping effects on other types of insurance not before us. For example, Underwriters point to *Custom Companies, Inc. v. North Rivers Insurance Co.*, No. 11 C 8367, 2013 WL 441170 (N.D. Ill. Feb. 5, 2013) (mem. op.). In *Custom Companies*, a federal district court construed an insurance policy containing a "Contingent Cargo Liability Endorsement" and held that the insurer's liability was subject to an offset for amounts recovered from third parties. 2013 WL 441170, at *2, *7. The nature of the policy was not disputed. *Id. Custom Companies* is thus distinguishable. First, it involved a contract not before this court. Second, the "Contingent Cargo Liability Endorsement" in that case explicitly provided only excess coverage. *Id.* Finally, no party appears to have suggested in that case that the use of the word "contingent" in a caption was controlling and created substantive rights or obligations; thus, the court did not consider the same type of argument raised by Underwriters.

constitutions); *Samano v. Sun Oil Co.*, 621 S.W.2d 580, 581–82 (Tex. 1981) (holding that "the correct rule" in interpreting contracts is that "modifiers are intended to refer to the words closest to them in the sentence"); *Montanye v. Transamerica Ins. Co.*, 638 S.W.2d 518, 521 (Tex. App.—Houston [1st Dist.] 1982, no writ) (applying doctrine to Texas Insurance Code). Under the "last antecedent" doctrine, a canon of contract and statutory construction, "relative and qualifying words, phrases and clauses are to be applied to the words or phrases immediately preceding, and are not to be construed as extending to or including others more remote." *Montanye*, 638 S.W.2d at 521. Further, "modifiers are intended to refer to the words closest to them in [a] sentence." *Samano*, 621 S.W.2d at 581–82. If we can do so without "impairing the meaning" of the policy's language, we should interpret "contingent" as modifying "cash in transit," rather than "insurance." *Spradlin*, 34 S.W.3d at 580. This interpretation is reasonable because Cardtronics leased the "cash in transit" from Bank of America and placed it in transit only to refill automatic teller machines on an as-needed basis, with unneeded cash returned to Mount Vernon's vaults. The amount and status of the cash as "in transit" are both contingent on the replenishment needs of Cardtronics's automated teller machines. Further, as we have already noted, the cover note uses the term "Contingent Cash in Transit" both with and without reference to

26

"insurance," implying that "insurance" cannot be the modified term in all uses of this phrase.

### b.     *Additional policy provisions*

Three other policy provisions also support construction of the policy as not requiring exhaustion. First, the only duties expressly imposed on the policyholder in the event of a loss are those set forth in subparagraph E.1.G of the policy, entitled "Duties In The Event Of Loss." Nowhere in the policy—not even in this section setting forth the insured's duties in the event of a loss—does it state that Underwriters need not pay the loss unless there has been a final adjudication concerning the responsibility of specified third parties to pay for the insured's loss. Nor does the policy require the policyholder to institute suit or make a claim against a potentially responsible third party, nor does it contain any terms governing the recovery of expenses relating to seeking payment from a third party. It only requires that the policyholder notify Underwriters of the loss; submit to an examination under oath if requested; provide a detailed, sworn proof of loss within 120 days of learning of the loss; and cooperate with Underwriters in the investigation and settlement of any claim.

Second, the policy-imposed deadline for making a claim against Underwriters and the absence of any provision extending the deadline in order for the policyholder to exhaust claims against third parties support this construction.

Subparagraph E.1.M provides that Cardtronics could bring legal action against Underwriters only if it has complied with all terms of the policy and if at least ninety days have elapsed from the filing of a proof of loss, and then only "within 2 years from the date [Cardtronics] discover[ed] the loss." Under the policy, "Discovery of loss occurs when [Cardtronics] *first* become[s] aware of facts which would *cause a reasonable person to assume* that a loss covered by this policy has been or will be incurred, *even though the exact amount or details of loss may not then be known.*" (emphasis added). Thus, the policy required Cardtronics to pursue its claim even though there is uncertainty regarding its amount—uncertainty that could be created because of potential claims against third parties or unresolved existing claims against third parties.

Third, subparagraph E.1.X—the provision of the policy entitled "Transfer Of Your Rights Of Recovery Against Others To Us"—also supports this construction. That subparagraph provides for subrogation in the event that Underwriters pay a loss. It states:

> You must transfer to us all your rights of recovery against any person or organization for any loss you sustained and for which we have paid or settled. You must also do everything necessary to secure those rights and do nothing after loss to impair them.

We agree with Cardtronics that these various terms can be harmonized by construing "cannot recover" to mean that Underwriters must pay only the amounts that Cardtronics did not recover despite taking reasonable steps to secure

Underwriters' claims against Mount Vernon and its insurers by the time that Cardtronics submitted its proof of loss. Thus, the policy does not require Cardtronics to exhaust its remedies against third parties such as Mount Vernon before filing suit against Underwriters or obtaining a recovery in such a suit. In the event that Underwriters must pay a claim before any third party claims are resolved, Underwriters retain their subrogation rights and would be entitled to pursue such claims, subject to the distribution scheme set forth in the policy for any recovery.

Under our construction, Underwriters will not have to pay for more than the ultimate loss suffered by Cardtronics. The issue is not the amount that Underwriters will ultimately pay but the timing of Underwriters' payment.[7] And our construction grants Underwriters more control over determining the amount of the loss as well as the timing of the litigation because it will be able to control the litigation against the third parties. Finally, our construction does not reduce Cardtronics's incentives to recover from third parties before the contractually imposed deadlines; if Cardtronics believes it can recover more quickly from the

---

[7]  To illustrate, if the loss is $3 million, Underwriters are required to pay timely that amount. If a third party is subsequently determined to have responsibility for $1 million of the loss and pays this amount, then Underwriters will, after that recovery, sustain a net loss of $2 million. Its net payment is the same if the policy is interpreted to require the policyholder to pursue the third party claim (assuming it is resolved in the same manner). The difference is the timing of the payment and the risks and costs associated with pursuing the third party claim.

third parties than it can from Underwriters, it certainly has incentive to pursue such claims. Moreover, Underwriters could contend—although they did not do so here—that the policyholder did not take reasonable steps to secure Underwriters' claims against third parties before the contract deadlines.

In conclusion, we hold that "cannot recover" applies at the time of the proof of loss, which gives meaning to all provisions of the policy and therefore is not unreasonable. Contracts should be interpreted to avoid rendering a provision meaningless, such as the deadlines imposed by the policy. It is therefore reasonable to interpret subparagraph E.4.A's "cannot recover" to mean "cannot recover at the time the insured submits its proof of loss within 120 days of when the insured learns of the loss."

Because we hold that Cardtronics was not required to exhaust its remedies against third parties, we hold that Cardtronics is entitled to payment of its claim in full, with a credit for the amount already paid by Underwriters. We therefore overrule Underwriters' first issue. Underwriters' second and third issues are premised on the assumption that Cardtronics was required to exhaust its remedies against third parties; those issues are therefore likewise overruled.

## Conclusion

Because the time limits contained in the policy cannot be reconciled with a policy construction requiring Cardtronics to determine conclusively what it

30

"cannot recover" from Mount Vernon and its insurers, the trial court did not err in concluding that Cardtronics had no duty to exhaust its remedies. Because coverage was triggered immediately and Underwriters do not dispute that Cardtronics suffered a covered loss, Cardtronics's claim is immediately payable. We affirm the grant of partial summary judgment to Cardtronics and remand to the trial court for further proceedings.

Harvey Brown
Justice

Panel consists of Justices Jennings, Sharp, and Brown.