**Opinion issued August 31, 2021**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-18-00396-CV

———————————

**TPG (POST OAK) ACQUISITION, LLC, TPG (POST OAK) MEZZANINE, LLC, THE PICERNE GROUP, INC., TPG, INC., ALLIED REALTY ADVISORS, LLC, ALLIED REALTY PARTNERS, LLC, ALLIED ORION GROUP, LLC D/B/A ALLIED REALTY, ACS RESTORATION GC, LLC D/B/A ALLIED CONSTRUCTION SERVICES, AND TPG 2011-4 (POST OAK), LLC, Appellants/Cross-Appellees**

**V.**

**GREYSTONE MULTI-FAMILY BUILDERS, INC., GREYSTONE (POST OAK), LLC, AND WALTER B. EEDS, Appellees/Cross-Appellants**

———————————

**On Appeal from the 334th District Court**
**Harris County, Texas**
**Trial Court Case No. 2015-25232**

———————————

# MEMORANDUM OPINION

Appellants/cross-appellees, TPG (Post Oak) Acquisition, LLC ("TPG Owner") and TPG 2011-4 (Post Oak), LLC ("TPG 2011-4") (collectively, the "TPG Parties"),[1] challenge the trial court's judgment, entered after a bench trial, partially in favor of appellees/cross-appellants, Greystone Multi-Family Builders, Inc. ("GMFB"), Greystone (Post Oak), LLC ("GPO"), and Walter B. Eeds (collectively, the "Greystone Parties"), and partially in favor of the TPG Parties, in the Greystone Parties' suit against the TPG Parties for, among other things, breach of a construction contract, TPG Owner's countersuit for, among other things, breach of a construction

---

[1] Although appellants/cross-appellees TPG (Post Oak) Mezzanine, LLC ("TPG Mezzanine"), The Picerne Group, Inc., TPG, Inc., Allied Realty Advisors, LLC, Allied Realty Partners, LLC, Allied Orion Group, LLC, doing business as Allied Realty, and ACS Restoration GC, LLC, doing business as Allied Construction Services, also filed a notice of appeal in this case, the appellants' brief filed on their behalf states that these specific appellants/cross-appellees do not intend to "raise [any] appellate complaints." An appellant's brief must "state concisely all issues or points presented for review." TEX. R. APP. P. 38.1(f). And an appellant that does not actually identify any issues in an appellant's brief waives any issues that it sought to raise in its appeal. *See id.*; *Martinez v. Ward*, 303 S.W.3d 326, 328 (Tex. App.—El Paso 2009, no pet.); *see also Custer v. Wells Fargo Bank, N.A.*, No. 03-15-00362-CV, 2016 WL 1084165, at *1 n.1 (Tex. App.—Austin Mar. 18, 2016, pet. dism'd w.o.j.) (mem. op.) (holding appellant waived issue as inadequately briefed when she did not actually raise issue on appeal). We hold that TPG Mezzanine, The Picerne Group, Inc., TPG, Inc., Allied Realty Advisors, LLC, Allied Realty Partners, LLC, Allied Orion Group, LLC, doing business as Allied Realty, and ACS Restoration GC, LLC, doing business as Allied Construction Services, have waived any issues that they sought to raise in this appeal by failing to actually identify their issues in the appellants' brief filed on their behalf. *See Strange v. Cont'l Cas. Co.*, 126 S.W.3d 676, 678 (Tex. App.—Dallas Jan. 29, 2004, pet. denied) ("We cannot remedy deficiencies in a litigant's brief . . . .").

contract, and TPG 2011-4's suit in intervention for breach of a limited liability company agreement and breach of a personal guaranty. In eight issues, the TPG Parties contend that (1) the trial court erred in rendering judgment in favor of GMFB on the competing claims for breach of a construction contract, (2) the evidence was legally and factually insufficient to support the trial court's award of damages to GMFB on its claim for breach of a construction contract, (3) the trial court erred in awarding GMFB—rather than TPG Owner—attorney's fees under the construction contract, (4) the trial court, after finding that TPG 2011-4 was the prevailing party on its claims for breach of the limited liability company agreement and the personal guaranty, erred in awarding an insufficient amount as damages for construction cost overruns, and (5) the trial court erred in failing to award TPG 2011-4 any attorney's fees against Eeds under the guaranty.

In three issues on cross-appeal, the Greystone Parties contend that the trial court erred in (1) awarding less than all of GMFB's reasonable out-of-pocket expenses on its claim for breach of a construction contract, (2) assessing damages against GPO on TPG 2011-4's claim for breach of a limited liability agreement, and (3) awarding any, or alternatively excessive, attorney's fees against GPO on TPG 2011-4's claim for breach of a limited liability agreement.

We affirm in part, reverse in part, render in part, and remand in part.

**Background**

In their third amended petition, the Greystone Parties alleged that in 2011, Eeds had an option to purchase about three acres of land on South Post Oak Lane in Houston, Texas, where he wanted to construct a midrise, multi-family apartment complex. He and Kenneth Picerne, owner of The Picerne Group, Inc., agreed to work cooperatively toward the development of the apartment complex (the "Project") and, for that purpose, formed various entities and executed a series of contracts for the Project's design, financing, and construction.

***The Construction Contract[2]***

In August 2012, TPG Owner, an entity affiliated with Picerne, and GMFB, an entity affiliated with Eeds, executed a contract for the planned construction of the Project (the "Construction Contract"). The Construction Contract included two documents: (1) AIA Document A103-2007, a standard form agreement between an owner and contractor where the basis of payment is the cost of the work plus a fee without a guaranteed maximum price and (2) AIA Document 201-2007, the general conditions of the contract for construction.[3]

---

[2]    The Greystone parties attached a copy of the Construction Contract to their petition. A copy of the Construction Contract was also admitted into evidence at trial.

[3]    The terms of these form agreements were negotiated and amended by the parties.

4

The Construction Contract designated TPG Owner as the owner and GMFB as the builder. It provided that GMFB would be "solely responsible for, and have control over, construction means, methods, techniques, sequences and procedures and for coordinating all portions of the Work[4] under the [Construction] Contract," except when otherwise specified by the contract documents. "Communications by and with Subcontractors and material suppliers" would be "through GMFB." The Construction Contract required TPG Owner to pay GMFB the "Contract Sum," which was defined as the "Cost of the Work" plus a three percent "Contractor's Fee" up to the budget amount (the "Controlled Estimate"), plus any change orders approved by TPG Owner that raised the initial budget.

Both TPG Owner and GMFB could terminate the Construction Contract. As to TPG Owner, the Construction Contract contemplated two types of termination: (1) termination for convenience "at any time . . . without cause" and (2) termination for cause based on a default by GMFB as the contractor. The nature of the termination determined the recoverable damages. If TPG Owner terminated the Construction Contract for convenience, GMFB, "as its sole remedy, [was] entitled to receive payment for Work executed, and costs incurred by reason of such termination," not to exceed the Contract Sum. But if GMFB was in default "after

---

[4]     "Work" was defined in the Construction Contract as "the construction and services required by the Contract Documents" and "the whole or a part of the Project."

5

applicable notice and cure periods" and TPG Owner, upon written notice, terminated GMFB's right "to proceed or continue the Work or any part thereof," then TPG Owner's recoverable damages consisted of "actual damages, together with any increased costs to [TPG] Owner to achieve final completion and the cost of any delay resulting from [GMFB's] default." And GMFB would not be "entitled to receive any payment that may be claimed by [it] until after final completion and after [TPG] Owner ha[d] assessed and charged [GMFB] for costs and damages for which [GMFB was] liable to [TPG] Owner pursuant to the Contract Documents." The Construction Contract stated that TPG Owner's rights upon termination for cause based on a GMFB default "shall be in addition to and not in limitation of any other rights of [TPG] Owner granted in the Contract Documents or at law or in equity."

In the event of litigation between TPG Owner and GMFB, the Construction Contract authorized the trial court to determine the prevailing party and order the reimbursement of the prevailing party's "reasonable out-of-pocket expenses incurred in connection therewith, including without limitation reasonable attorney['s] fees[.]"

*The LLC Agreement*[5]

In connection with the planned construction of the Project, TPG 2011-4, an entity affiliated with Picerne, and GPO, an entity affiliated with Eeds, jointly formed TPG (Post Oak) Mezzanine LLC ("TPG Mezzanine") and entered into the Amended and Restated Liability Company Agreement of TPG (Post Oak) Mezzanine, LLC (the "LLC Agreement"). The stated purposes of TPG Mezzanine were to: (1) serve as the sole member of TPG Owner (and thus the indirect owner of the Project), (2) acquire the Project land, and (3) develop the Project land.

In this regard, the LLC agreement governed the ownership and financing of the Project. It provided that TPG 2011-4 held an eighty percent ownership interest in TPG Mezzanine and was the managing member "responsible for the day-to-day management" of the Project's "business and affairs." GPO, designated as the developer in the LLC Agreement, held a twenty percent interest in TPG Mezzanine and, subject to TPG 2011-4's "approval of all aspects of the design and permitting," was responsible for preparing the budget and planning the Project. A default under the Construction Contract was incorporated as a default under the LLC Agreement.

Under the LLC Agreement, TPG 2011-4 made the initial capital contribution for the land acquisition and agreed to contribute ninety-five percent of any additional

---

[5] The Greystone parties attached a copy of the LLC Agreement to their petition. A copy of the LLC Agreement was also admitted into evidence at trial.

capital contributions found to be necessary. GPO agreed to contribute the remaining five percent of additional capital contributions and to pay "[a]ll Construction Cost Overruns," contractually defined in the LLC Agreement as "[t]he amount by which the actual cost of the Land acquisition and the Construction Work exceed[ed] the Construction Budget," after the application of available contingencies and the reduction of the Contractor's Fee.

Like the Construction Contract, the LLC Agreement authorized the recovery of fees and expenses in the event of legal proceedings to enforce its terms. It rendered "the non-prevailing party" responsible for "all costs and expenses in connection [with the legal proceedings], including without limitation, reasonable attorney['s] fees and witness fees."

*The Guaranty[6]*

As a condition of entering into and performing its obligations under the LLC Agreement, TPG 2011-4 required Eeds to personally guarantee certain obligations of GPO. To that end, Eeds executed the Performance and Payment Guaranty (the "Guaranty") in which he guaranteed, among other things, "the prompt and complete payment and performance" of GPO's obligations to pay Construction Cost Overruns, as defined in the LLC Agreement, unless such Construction Cost Overruns were caused by any act, omission, or negligence of TPG 2011-4. Upon a

---

[6] A copy of the guaranty was admitted into evidence at trial.

8

default of the guaranteed obligations, TPG 2011-4 could file suit against Eeds and recover as damages: "(i) all cost related to the completion and performance of the Guaranteed Obligations; (ii) damages arising from any delay in completing the Guaranteed Obligations . . . ; and (iii) [TPG 2011-4's] reasonable attorney['s] fees and costs . . . incurred in enforcing th[e] Guaranty."

The Greystone parties alleged that problems arose during construction of the Project. Although GMFB had 699 days to substantially complete construction of the Project, circumstances beyond its control made it impossible to meet the deadline. For instance, GMFB "encountered a previously undisclosed underground obstruction" and GMFB's construction activities were "significantly impacted by severe Houston weather." In addition, GMFB discovered "unanticipated groundwater[] which impacted [its] ability to install footers and shoring and prepare the site for vertical construction." GMFB was also impacted by TPG Owner's failure to timely pay GMFB and subcontractors for work performed in connection with the Project, and TPG Owner's payment of "less than the amount" it was obligated to pay. The late payments to subcontractors had a severe impact on the Project as "[n]umerous subcontractors walked off the job, filed liens on the property, and/or increased their prices in response." A decrease in available workers directly interfered with GMFB's ability to comply with the construction schedules.

9

According to the Greystone parties, TPG Owner also took on the role of a "de-facto [g]eneral [c]ontractor" and actively interfered with GMFB's performance as the general contractor. Among other things, TPG Owner had a representative present on site multiple days a week, required GMFB to include it on daily and weekly reports and communications with subcontractors, refused to allow work to proceed until it was able to evaluate the construction method and the material used, changed the sequence of the work, met with subcontractors to question the means and methods of their work, participated in interviews of potential GMFB personnel who would be assigned to work on the Project, ordered additional inspections and tests by third-party consultants or prevented third-party consultants from performing regular tests and inspections, directed the protocol for work it determined needed to be repaired, instructed subcontractors to perform their work in a manner inconsistent with the Project's plans and specifications, and directed GMFB to stop performing certain work. Additionally, when TPG Owner interacted with subcontractors for the Project, the interaction was negative and created an environment where the subcontractors felt that "no one could do anything correctly." TPG Owner's micromanagement of the Project "eliminated any chance GMFB had of completing the [P]roject within the . . . budget."

The Greystone parties also alleged that TPG Owner refused to sign valid change orders. TPG Owner would typically verbally direct GMFB and the

10

subcontractors to perform work that was outside the scope of the subcontractor's contract or that was inconsistent with the Project's plans and specifications. GMFB and the subcontractors would comply, but when they approached TPG Owner with a written change order showing the change, TPG Owner would refuse to sign it or indefinitely delay signing it.

According to the Greystone parties, by April 2015, the Project was about seventy-five percent complete. Yet, without any notice or opportunity to cure, TPG Owner improperly terminated GMFB for cause. TPG Owner asserted that GMFB had "[f]ail[ed] to make proper payment to a [s]ubcontractor or for materials or labor," "[d]isregard[ed] . . . applicable laws, ordinances, rules, and regulations or violat[ed] . . . order[s] of any public authority claiming jurisdiction over the Work," "[f]ail[ed] to comply with the scheduling requirements set forth in the Construction Schedule," "[f]ail[ed] to promptly replace rejected materials or correct rejected workmanship, "[r]efus[ed] or fail[ed] to prosecute the Work or any separate part thereof with such diligence as will insure Substantial Complete on or before the Scheduled Completion Date," and "[failed to construct the Project] in compliance with all applicable federal, state, and local laws, ordinances[,] and regulations." But GMFB was not "in default" and termination was improper because TPG Owner failed to give GMFB the contractually-required notice of default, failed to provide

11

an opportunity to cure any alleged default, and failed to describe any of GMFB's alleged defaults with any degree of specificity.

Finally, the Greystone parties alleged that under the LLC Agreement, GPO was entitled to access of TPG 2011-4's books and records, and GPO was denied access to the books and records for more than a year.

GMFB brought, among others, claims against TPG Owner for breach of the Construction Contract and a declaratory judgment, requesting damages, attorney's fees, and declarations that it was not in default under the Construction Contract, TPG Owner did not have "cause" to terminate the Construction Contract, and TPG Owner failed to provide contractually-required notice and an opportunity to cure. Related to its claim for breach of the Construction Contract, GMFB asserted that the Construction Contract was a valid and enforceable agreement, GMFB was a proper party to sue for breach of the Construction Contract, GMFB performed its contractual obligations under the terms of the Construction Contract, TPG Owner breached multiple provisions of the Construction Contract, which GMFB identified, and TPG Owner's breaches proximately caused GMFB to suffer damages.

GPO brought, among others, a claim against TPG 2011-4 for breach of the LLC Agreement based on TPG 2011-4's alleged failure to keep proper books and records and requested damages and attorney's fees. GPO asserted that the LLC Agreement was a valid and enforceable contract, GPO was the proper party to sue

12

for breach of the LLC Agreement, GPO performed its contractual obligations under the terms of the LLC Agreement, TPG 2011-4 breached multiple provisions of the LLC Agreement, which GPO identified, and TPG 2011-4's breaches proximately caused GPO to suffer damages.

The TPG Parties answered, generally denying the allegations in the Greystone parties' petition and asserting certain defenses.

TPG Owner then brought, among others, a counterclaim against GMFB for breach of the Construction Contract, requesting damages and attorney's fees. TPG Owner asserted that the Construction Contract was a valid and enforceable contract, TPG Owner performed its contractual obligations under the Construction Contract, and GMFB breached the Construction Contract by "failing to execute the Work," "breaching covenants to 'exercise [GMFB]'s best skill, efforts[,] and judgments in furthering the interests of [TPG] Owner,'" "failing to 'achieve Substantial Completion of the entire Work within six hundred ninety-nine . . . days of the Commencement Date," "failing to pay 'liquidated damages, an amount equal [to $2,089.00] per day, for each day of delay . . . until Substantial Completion of Work . . . was achieved,'" "allowing the Project's Cost of Work to exceed the Control Estimate without TPG's Owner's prior written consent," "breaching its duty to 'assign[] or divid[e] the Work among [s]ubcontractors as necessary,'" "failing 'to make proper payment to a [s]ubcontractor or for materials or labor,'" "disregarding

'applicable governmental laws, ordinances, rules, and regulations' and violating '[orders] of a[] public authority claiming jurisdiction over the Work,'" "failing 'to comply with the scheduling requirements set forth in the Construction Schedule,'" "failing 'to promptly replace rejected materials or correct rejected workmanship,'" "refusing and/or failing 'to prosecute the Work or any separate part thereof with such diligence as w[ould] insure Substantial Completion on or before the Scheduled Completion Date,'" "failing to construct the Project 'in compliance with all applicable federal, state[,] and local laws, ordinances[,] and regulations,'" "breaching its duty to inspect 'portions of Work already performed to determine that such portions are in proper condition to receive subsequent work,'" "breaching its warranties that 'materials and equipment furnished under the [Construction] Contract will be of good quality . . . and that the Work will conform to the requirements of the Contract Documents and will be free from defects,'" "failing to 'secure and pay . . . other permits or utility company fees, licenses, and inspections, testing and approval of governmental agencies necessary for proper execution and completion of the Work,'" "failing to 'comply with and give notices required by applicable laws, statutes, ordinances, codes, rules[,] and regulations, and lawful orders of public authorities applicable to performance of the Work,'" "breaching its duty 'to employ a competent superintendent and necessary assistants who [were] in attendance at the Project site during performance of the Work,'" "failing to 'pay each

14

[s]ubcontractor upon receipt of payment from [TPG] Owner,'" "breaching its duty to 'promptly correct Work rejected by the Architect or [TPG] Owner which fail[ed] to conform to the requirements of the Contract Documents,'" "breaching its duty to 'remove from the site portions of the Work that [were] not in accordance with the Contract Documents and [were] neither corrected by [GMFB] nor accepted by [TPG] Owner,'" "failing to 'bear the cost of correcting destroyed or damaged construction,'" and "breaching its duty to 'enclose and protect the Work, and all material and equipment stored at the Project.'" According to TPG Owner, GMFB's breaches caused delays, cost overruns, and damages. TPG Owner requested the contractually-specified-default remedies for termination for cause based on GMFB's alleged breaches.[7]

Additionally, TPG 2011-4 filed in a petition in intervention. In its second amended petition in intervention, TPG 2011-4 brought a claim against GPO for breach of the LLC Agreement and a claim against Eeds for breach of the Guaranty, requesting damages and attorney's fees. Related to the claim for breach of the LLC Agreement, TPG 2011-4 alleged that the LLC Agreement was a valid and enforceable contract, TPG 2011-4 was the proper party to sue for breach of the LLC Agreement, TPG 2011-4 performed its contractual obligations under the LLC

---

[7] GMFB answered, generally denying the allegations in TPG Owner's counterclaim and asserting certain defenses.

15

Agreement, and GPO breached the LLC Agreement by "failing to pay the Project's Construction Cost Overruns, failing to make Additional Capital Contributions required under the [LLC] Agreement, and failing to guaranty completion of construction." GPO's breaches proximately caused TPG 2011-4 to suffer damages. As to its claim for breach of the Guaranty, TPG 2011-4 alleged that the Guaranty was a valid and enforceable contract, TPG 2011-4 was the proper party to sue for breach of the Guaranty, TPG 2011-4 performed its contractual obligations under the Guaranty, and Eeds breached the Guaranty by "failing to pay for Construction Cost Overruns[,] failing to make capital contributions required[,] . . . failing to pay for the reduction required[,] . . . and failing to guaranty completion of construction." Eeds's breaches proximately caused TPG 2011-4 to suffer damages.[8]

At trial, TPG Owner presented its claim that GMFB hired unqualified subcontractors, missed contract deadlines, did not perform certain work according to the specifications or applicable laws, failed to correct defective materials and workmanship, and submitted requests for payment that were riddled with errors. David McMahan, President of GMFB when GMFB was terminated under the Construction Contract, testified that, in some areas of the Project, GMFB sought as many as fourteen or fifteen bids from subcontractors, even though it was typical in

---

[8] In response to the petition for intervention, GPO and Eeds answered, generally denying the allegations in the petition and asserting certain defenses.

16

his experience to obtain only three to five bids "at most." He explained that GMFB "bid to a lot deeper group of subcontractors" in order to "drive the number down and stay within budget." A memorandum from Ken Picerne to two of TPG Owner's representatives for the Project, Eric Donnelly, Executive Vice President of Construction for The Picerne Group, Inc., and Sam McInnis, a construction manager for The Picerne Group, Inc., described the subcontractors hired by GMFB as "mostly low bidders and in some instances not qualified to perform the work at all."[9]

McMahan also testified to numerous missed deadlines under the Construction Contract. TPG Owner attributed some of the delay to, among other things, GMFB's failure to correct structural and waterproofing problems. Donnelly testified that noncompliant structural work was discovered by the structural engineer whose approval was needed to obtain a City of Houston occupancy certificate during inspection, but neither GMFB nor its framing subcontractor corrected it. Donnelly also testified that on the building's exterior, there were water leaks at balconies, windows, and the roof, which GMFB was repeatedly asked to correct. Regarding payment to GMFB, Donnelly testified that GMFB's requests for payment included numerous errors, often because GMFB allowed subcontractors to invoice for incomplete or defective work and undelivered materials.

---

[9] The trial court admitted the memorandum into the evidence at trial.

17

In April 2015, when the Project was estimated to be about seventy-five percent complete, TPG Owner purported to terminate the Construction Contract "for cause." In its "Notice of Termination of General Contractor,"[10] TPG Owner alleged that GMFB was "in material default under the terms and conditions of the Construction Contract, including without limitation, for the reasons described in [s]ections 2.4(c), 2.4(d), 2.4(e), 2.4(f), 2.4(g) and 2.4(h) of the A201." The Construction Contract subsections listed in the termination notice defined a default by GMFB to include (1) the failure to make proper payment to a Subcontractor or for materials or labor (section 2.4(c)); (2) the disregard of applicable governmental laws, ordinances, rules and regulations (section 2.4(d)); (3) the failure to comply with the contract scheduling requirements (section 2.4(e)); (4) the failure to promptly replace rejected materials or correct rejected workmanship (section 2.4(f)); (5) the failure to prosecute the work, or any separate part thereof, with such diligence as would insure substantial completion on or before the scheduled completion date (section 2.4(g)); and (6) the failure to construct the Project in compliance with all applicable federal, state, and local laws, ordinances and regulations (section 2.4(h)).

Donnelly and McInnis testified that TPG Owner discovered structural, waterproofing, plumbing, electrical, and other defects after terminating GMFB.

---

[10] TPG Owner's notice of termination was admitted into the evidence at trial.

This, according to the testimony of Jon Demorest from The Picerne Group, Inc., required an investment of millions more dollars to complete the Project.

According to GMFB, most of the delay in construction was attributable to TPG Owner or to other factors outside GMFB's control. McMahan testified that TPG Owner acted more like a contractor than an owner during construction. Donnelly and other TPG representatives for the Project "would go directly to the subcontractors, talk to them, [and] direct them to do things differently" than GMFB had instructed. McMahan stated that this created confusion and delay because the Project "need[ed] one voice and one boss to run it." Consistent with McMahan's assessment of the reasons for delay, William Stewart, a project manager also with GMFB, testified that TPG Owner's aggressive management style hurt both morale and productivity. TPG Owner often demanded that work be stopped until its representatives, such as Carson Harris, a construction manager for the Project, were available to personally inspect the work. According to Stewart, the constant "stopping and waiting" made it "hard to get momentum." And the resulting delay caused subcontractors to go work elsewhere, which forced GMFB to get "back in line" for the subcontractors' time.

Mary Simcox, an accounting manager for the Greystone Parties, testified that TPG Owner failed to pay draw requests on time and acted unreasonably in reviewing those requests. This also caused subcontractors to walk off the Project and

19

sometimes forced GMFB to pay subcontractors out of its own pocket. As described by Stewart, the Project "would get a little momentum going," but then a subcontractor "wouldn't get paid" and "wouldn't show up." Stewart testified an unpaid subcontractor's absence was "understandable" because "[t]hey work on thin margins and they have to go to another job where they're going to get paid[.]" In addition, GMFB's Vice President, Keith Reilly, testified that TPG Owner failed to sign change orders so that the work could be treated as a cost overrun for which the GPO was responsible, rather than as part of the construction budget.

According to GMFB's expert John Cotton, who was retained to "independently identify, quantify, and apportion critical path delays that occurred on the [P]roject," all of this, along with changes made by TPG Owner to the sequence of the construction intended by GMFB, negatively impacted the construction schedule and budget, as well as the availability of skilled labor.

The trial court rendered judgment in favor of GMFB on the competing claims for breach of the Construction Contract, awarding it (1) the unpaid Contract Sum of $506,513.88, (2) all reasonable out-of-pocket expenses, including attorney's fees and costs, "incurred by GMFB in connection with its enforcement of obligations under the Construction Contract, for a total of $3,620,306.62," (3) court costs, and (4) pre- and post-judgment interest against TPG Owner. The trial court ordered that TPG Owner "shall take nothing under the Construction Contract."

20

The trial court also rendered judgment in favor of TPG 2011-4 on its claims for breach of the LLC Agreement and Guaranty, awarding it $647,717.13 in Construction Cost Overruns against GPO and Eeds, jointly and severally. And against GPO, the trial court awarded TPG 2011-4 attorney's fees of $2,565,526 under the LLC Agreement. The trial court did not award TPG 2011-4 any attorney's fees against Eeds under the Guaranty. The trial court ordered that "GPO shall take nothing under the [LLC] Agreement."

The trial court entered certain findings of fact and conclusions of law on general facts about the parties' course of dealings and specific facts about the execution and performance of the Construction Contract, the LLC Agreement, and the Guaranty. Generally, the trial court found:

1.  On or about November 30th, 2011, [Eeds] and The Picerne Group, Inc. . . . entered into an agreement . . . to work cooperatively in the development of an approximately 277[-]unit apartment project.

2.  . . . Eeds and [The Picerne Group, Inc.] both formed separate single purpose entities which then formed a single joint venture entity.

3.  Eeds formed [GPO] and [The Picerne Group, Inc.] formed [TPG 2011-4]. TPG 2011-4 and [GPO] jointly formed [TPG Mezzanine] and entered into [the LLC Agreement].

4.  The stated purpose of TPG Mezzanine was to be the sole member of [TPG Owner]. Through TPG Owner, TPG Mezzanine would acquire land for development of [the] 277[-]unit apartment project.

21

5.    TPG Owner entered into [the Construction Contract] with [GMFB] to be the Contractor for the development.

6.    From the beginning of the contractual relationship, both parties failed to honor the formalities of the contracts.

7.    From the beginning of the contractual relationship, there was considerable delay—some attributable to the parties, and some due to factors outside both parties['] control.

Regarding the Construction Contract, the trial court found in pertinent part:

20.   Pursuant to the Construction Contract, GMFB was hired as the Contractor to develop the [P]roject for TPG Owner. TPG Owner . . . agreed to pay GMFB the "Contract Sum[.]"

21.   The Contract Sum is the "Cost of the Work" plus the "Contractor's Fee[.]"

22.   Cost of the Work is defined in the Construction Contract as costs necessarily incurred by [GMFB] in the proper performance of the Work. Such costs should be at rates not higher than as set forth in the Control Estimate except with the prior written consent of [TPG] Owner. The Cost of the Work should include only the items set forth [in] Article 7 of the Construction Contract, but should not exceed the Control Estimate without [TPG] Owner's prior written approval.

23.   The Control Estimate is attached as Exhibit D to the Construction Contract. The Control Estimate should include the estimated Cost of the Work plus the Contractor's Fee.

24.   The budget set forth in the Control Estimate for the Cost of the Work is $32,367,617. This includes $1,460,173 in Hard Cost Contingency.

25.   The [Construction] [C]ontract provides for a Contractor's Fee at 3% of the Cost of the Work. The Contractor's Fee was not to exceed $902,387, subject to any increases in the Cost of [t]he

22

Work to the extent resulting from Change Orders or Construction Change Directives.

26. GMFB, as Contractor, was to be solely responsible for, and have control over, construction means, methods, techniques, sequences, and procedures for coordinating all portions of the Work under the [Construction] Contract.

27. TPG Owner's representatives . . . Donnelly and . . . Harris interfered with the means and methods of construction by ordering multiple inspections, communicating directly to the subcontractors, directing which subcontractors should be hired, and exercising control over those subcontractors and the methods in which they worked.

28. Changes in the Work were to be accomplished through valid Change Orders or Construction Change Directives, only by prior written consent of [TPG] Owner.

29. Change Orders are written instruments signed by [TPG] Owner and [GMFB] stating their agreement upon 1) the change in the Work, 2) the amount of the adjustment, if any, to the contract sum, and 3) the extent of the adjustment, if any, in the contract time.

30. TPG Owner directed GMFB and/or its subcontractors to perform work that was beyond the scope of the Construction Contract. These directives came orally and through emails.

31. TPG Owner allowed GMFB to commence Work to be done under a Change Order prior to having a valid signed Change Order. This arrangement was mutually beneficial to the parties to avoid unnecessary delay.

32. GMFB completed Work to be done under the Change Orders and requested that TPG Owner sign them. TPG Owner's representatives confirmed through emails that the Change Orders were authorized, but did not sign them.

33. Section 2.4 of the Construction Contract sets out conditions of default.

34. [TPG] Owner could terminate [GMFB] for cause if [GMFB] was in default of the Construction Contract after applicable notice and cure periods[.] [TPG] Owner could, upon written notice to [GMFB], terminate [GMFB]'s rights under the Construction Contract.

35. TPG Owner did not serve GMFB with a written notice of default.

36. [TPG] Owner could, at any time, terminate the [Construction] Contract for [TPG] Owner's convenience and without cause.

37. In the case of such termination for [TPG] Owner's convenience, the [GMFB], as its sole remedy, would be entitled to receive payment for Work executed, and costs incurred by reason of such termination, but in no event in excess of the Contract Sum.

38. TPG Owner did serve GMFB with a written notice of termination.

The trial court concluded that the Construction Contract was a valid and enforceable agreement between TPG Owner and GMFB, governed by Texas law. The trial court further concluded:

3. TPG Owner's conduct waived the signing requirement for [C]hange [O]rders.

4. TPG Owner's conduct waived the non-waiver provision.

5. TPG Owner's failure to sign the Change Orders d[id] not render them invalid. The change in the work was authorized and GMFB completed the work under the Change Orders. The [c]ourt finds that the Change Orders were valid, and adjusts the Contract Sum to reflect that finding.

6.  The Control Estimate in the Construction Contract is the Hard Costs in the Construction Budget found in the [LLC] Agreement.

7.  The Control Estimate amount must be adjusted by the amount of Change Orders that were effectively approved.

8.  TPG Owner improperly terminated [GMFB] for cause. To terminate for cause, TPG Owner first needed to deliver written notice that GMFB was in default.

9.  The third[-]party inspection reports provided by "SCA" do not constitute written notice of default under the Construction Contract.

10. TPG Owner's representatives interfered with the means and methods of construction, which under the Construction Contract was the sole responsibility of GMFB as Contractor.

11. TPG Owner properly terminated [GMFB] for convenience. For TPG Owner to terminate GMFB for convenience under the Construction Contract, TPG Owner must simply provide written notice of termination. TPG Owner delivered a notice for termination, and the [c]ourt finds it was a termination by [TPG] [O]wner for convenience.

12. TPG Owner's termination of GMFB excused GMFB from further performance under the [Construction] [C]ontract.

13. The Court finds TPG Owner is liable to [GMFB] for the unpaid Contract Sum of $506,513.88.

14. Payments due an [sic] unpaid under the Construction Contract shall bear interest from the date payment is due at the rate of 5.25%. The court finds that payment was due, and interest began accruing on unpaid sums owed under the Construction Contract on April 30th, 2015—the date GMFB filed its lawsuit against TPG Owner.

15. [GMFB] is the prevailing party for purposes of [s]ection 15.6.2 of the Construction Contract.

25

As to the LLC Agreement and the Guaranty, the trial court found, in pertinent part:

10. Attached to [LLC] Agreement is the "Construction Budget," which is defined as [ ]the budget for the Land acquisition and the Construction Work, which has been prepared by [GPO] (based on virtually finals [sic] bids and final construction drawings) and Approved by [TPG 2011-4] . . . .

11. "Construction Work" is defined to include the construction and site work required to be performed by [GMFB] in connection with the Construction of the Proposed Development, as set forth in the Construction Contract.

12. Exhibit C to the [LLC] Agreement is a budget that contains three categories of costs: (1) Land acquisition; (2) Soft Costs; and (3) Hard Costs.

13. The Total Hard Costs amount is $32,367,617.

14. "Construction Cost Overruns" are the amount by which the actual cost of the [L]and acquisition and the "Construction Work" exceed the "Construction Budget[.]"

15. [TPG 2011-4] and [GPO] agreed that all Construction Cost Overruns, after the application of available contingencies and the reduction of the Contractor's Fee as provided in [s]ection 9.16.2, will be paid by [GPO].

16. [TPG 2011-4] and [GPO] agreed that the first $500,000 of the Construction Cost Overruns paid by [GPO] would not constitute Capital Contributions to [TPG Mezzanine]. The second $500,000 of Construction Cost Overruns paid by [GPO] will be treated as Capital Contributions to [TPG Mezzanine]. Construction Cost Overruns in excess of $1,000,000 paid by the [GPO] would not constitute Capital Contributions to [TPG Mezzanine].

26

17.    . . . Eeds agreed to a personal guaranty of [GPO's] obligations under the [LLC] Agreement.

The trial court made the following pertinent conclusions of law related to compliance with the LLC Agreement and the Guaranty:

2.    The [LLC] Agreement is governed by Delaware Law.

3.    The [LLC] Agreement defines Construction Cost Overruns to be the amount which the Hard Costs (including a contingency) exceed $32,367,617 and the Land [a]cquisition costs exceed $13,120,532.

4.    At the time of termination, the unexpended Hard Cost Contingency was $1,026,161.01.

5.    [The LLC] Agreement does not contemplate a termination of the Construction Contract for convenience. Therefore, the Court finds it inequitable to allow either party the benefit of any unused portions of the Hard Cost Contingency.

6.    The budgeted Hard Cost less the unexpected contingency amount equals $31,344,455.99. When GMFB was terminated as contractor, the total Hard Costs expended was $31,989,173.12. This total includes the $28,732,931.99 in budgeted Hard Costs, $3,023,954.73 in Proposed Orders and Change Orders and $232,286.50 in Contractor Fees.

7.    The Court finds that the amount of the Construction Cost Overruns that [GPO] is liable to [TPG 2011-4] under the [LLC] Agreement totals $647,717.13.

8.    [GPO]'s claim of breach of the [LLC] Agreement for failure to keep proper books and records fails because [GPO] hasn't proved that such a breach caused it damages.

9.    . . . Eeds personally guaranteed [GPO's] obligation to pay [C]onstruction [C]ost [O]verruns, and addition[al] capital

contributions. . . . Eeds is liable for $647,717.13 in the event [GPO] is unable to satisfy that obligation.

10. GPO is the non-prevailing party for purposes of [s]ection 19.12 of the [LLC] Agreement.

## Standard of Review

In an appeal from a bench trial, the trial court's findings of fact have the same weight as a jury verdict. *Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex. 1994); *Nguyen v. Yovan*, 317 S.W.3d 261, 269–70 (Tex. App.—Houston [1st Dist.] 2009, pet. denied). When the appellate record contains a reporter's record, findings of fact on disputed issues are not conclusive and may be challenged for the sufficiency of the evidence. *Sixth RMA Partners, L.P. v. Sibley*, 111 S.W.3d 46, 52 (Tex. 2003). We review the trial court's findings of fact under the same sufficiency-of-the-evidence standard used to determine whether sufficient evidence exists to support a jury finding. *See Catalina*, 881 S.W.2d at 297; *Nguyen*, 317 S.W.3d at 269–70.

When considering whether legally-sufficient evidence supports a challenged finding, we must consider the evidence that favors the finding if a reasonable fact finder could, and disregard contrary evidence unless a reasonable fact finder could not. *See City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). We view the evidence in the light most favorable to the trial court's finding and indulge every reasonable inference to support it. *Id.* at 822. Because it acts as the fact finder in

28

a bench trial, the trial court is the sole judge of the credibility of witnesses and the weight to be given to their testimony. *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003); *see also Wise v. Conklin*, No. 01-13-00840-CV, 2015 WL 1778612, at *3 (Tex. App.—Houston [1st Dist.] Apr. 16, 2015, no pet.) (mem. op.) ("In a bench trial, the trial court is the sole judge of the witnesses' credibility, and it may choose to believe one witness over another; a reviewing court may not impose its own opinion to the contrary."). If the evidence at trial "would enable reasonable and fair-minded people to differ in their conclusions," we will not substitute our judgment for that of the fact finder. *City of Keller*, 168 S.W.3d at 822.

When a party attacks the legal sufficiency of an adverse finding on an issue on which it had the burden of proof, the party must show on appeal that the evidence establishes, as a matter of law, all vital facts in support of the issue. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001). In reviewing a "matter of law" challenge, the reviewing court must first examine the record for evidence that supports the finding, while ignoring all evidence to the contrary. *Id.* If no evidence supports the finding, the reviewing court will then examine the entire record to determine whether the contrary proposition is established as a matter of law. *Id.* The issue should be sustained only if the contrary proposition is conclusively established. *Id.*

29

In a factual-sufficiency review, we consider and weigh all the evidence. *See Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986); *Arias v. Brookstone, L.P.*, 265 S.W.3d 459, 468 (Tex. App.—Houston [1st Dist.] 2007, pet. denied). When a party challenges an adverse finding on an issue on which it did not have the burden of proof at trial, we set aside the finding only if the evidence supporting it is so weak as to make it clearly wrong and manifestly unjust. *See Cain*, 709 S.W.2d at 176; *Reliant Energy Servs., Inc. v. Cotton Valley Compression, L.L.C.*, 336 S.W.3d 764, 782 (Tex. App.—Houston [1st Dist.] 2011, no pet.). When a party challenges an adverse finding on an issue on which it had the burden of proof at trial, the party must show on appeal that the adverse finding is against the great weight and preponderance of the evidence. *Dow Chem.*, 46 S.W.3d at 242; *Reliant Energy Servs.*, 336 S.W.3d at 782.

A party may not challenge the trial court's conclusions of law for factual sufficiency, but we may review the legal conclusions drawn from the facts to determine their correctness. *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002). In an appeal from a bench trial, we review the conclusions of law as legal questions, de novo and will uphold them if the judgment can be sustained on any legal theory supported by the evidence. *Id.* "If the reviewing court determines a conclusion of law is erroneous, but the trial court rendered the proper judgment, the erroneous conclusion of law does not require reversal." *Id.*

30

**Construction Contract**

In its first, second, third, fourth, and fifth issues, TPG Owner argues that the trial court erred in rendering judgment in favor of GMFB on the competing claims for breach of the Construction Contract because the trial court misinterpreted the Construction Contract, the evidence raised a fact issue as to whether GMFB breached the Construction Contract, the evidence was legally and factually insufficient to support the trial court's award of damages to GMFB under the Construction Contract, and because TPG Owner should have been the prevailing party on the breach of the Construction Contract claims, GMFB should not have been awarded attorney's fees under the Construction Contract.

In its second issue on cross-appeal, GMFB argues that the trial court erred in awarding less than all of GMFB's reasonable out-of-pocket expenses under the Construction Contract because GMFB "proved up fees and expenses of over $6 million, including a segregated amount of $3,620,306.62 in attorney['s] fees attributable to its claims under the Construction Contract."

## A. TPG Owner's claim under the Construction Contract

### 1. Subsection 2.4(i)'s notice-to-allow-cure requirement does not apply to GMFB's defaults alleged by TPG Owner

In a portion of its first issue, TPG Owner argues that the trial court erred in rendering judgment in favor of GMFB on TPG Owner's claim for breach of the Construction Contract because the trial court misconstrued the contractor-default

provision in section 2.4 of the Construction Contract.[11]  Specifically, TPG Owner

asserts that the trial court misinterpreted subsection 2.4(i) to require TPG Owner to

give GMFB written notice and an opportunity to cure all alleged defaults before

terminating GMFB for cause and this misinterpretation led the trial court to

erroneously treat TPG Owner's termination of GMFB as a termination for

convenience and render judgment against TPG Owner on its request for the

contractually-specified-default remedies under the Construction Contract.

Our primary concern in construing a written contract is to determine the

parties' true intent as expressed in the contract.  *Epps v. Fowler*, 351 S.W.3d 862,

865 (Tex. 2011); *Tellepsen Builders, L.P. v. Kendall/Heaton Assocs., Inc.*, 325

S.W.3d 692, 695 (Tex. App.—Houston [1st Dist.] 2010, pet. denied).  If the contract

is so worded that it can be given a definite or certain legal meaning, then it may be

construed as a matter of law.  *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983);

*Tellepsen Builders*, 625 S.W.3d at 696.

The Construction Contract permitted two types of termination by TPG

Owner—termination for convenience and termination for cause based on a

---

[11]     In the remainder of its first issue, TPG Owner asserts that even if the trial court's interpretation of section 2.4 was correct, it conclusively proved compliance with the as-interpreted requirements for a termination based on alleged GMFB defaults and, consequently, the trial court erred in failing to make findings of fact regarding the alleged GMFB defaults and any resulting damages.  We need not address this portion of TPG Owner's first issue.  *See* TEX. R. APP. P. 47.1.

contractor default. Terminations for cause are by the terms of section 2.5, which authorized TPG Owner to terminate the Construction Contract upon written notice if GMFB was in default "after applicable notice and cure periods" and recover specified damages consisting of "actual damages, together with any increased cost to [TPG] Owner to achieve final completion and the cost of any delay resulting from [GMFB's] breach."

A contractor default is contractually defined in section 2.4 of the Construction Contract as follows:

§ 2.4 CONTRACTOR'S DEFAULT
[GMFB] shall be in default of this Contract if:
(a) [GMFB] becomes insolvent, is adjudged a bankrupt, makes a general assignment for the benefit of its creditors, or becomes a subject of any proceedings commenced under any statute or law for the relief of debtors which is not dismissed within thirty (30) days after commencement;
(b) A receiver, trustee or liquidator of any of the property or income of [GMFB] shall be appointed;
(c) [GMFB] fails to make proper payment to a Subcontractor or for materials or labor unless [GMFB]'s nonpayment is due to [TPG] Owner's direct payment to Subcontractor or [TPG] Owner's default in its obligations under this Contract to pay [GMFB] for such portion of the Work or by reason of any good faith dispute with such Subcontractor or material supplier;
(d) [GMFB] disregards applicable governmental laws, ordinances, rules and regulations or violates any order of any public authority claiming jurisdiction over the Work;
(e) [GMFB] fails to comply with the scheduling requirements set forth in the Construction Schedule attached as Exhibit "C" to the Agreement;
(f) [GMFB] fails to promptly replace rejected materials or correct rejected workmanship as herein provided;

(g)  [GMFB] refuses or fails to prosecute the Work or any separate part thereof with such diligence as will insure Substantial Completion on or before the Scheduled Completion Date;

(h)  The Project is not constructed in compliance with all applicable federal, state and local laws, ordinances and regulations (provided, however, that to the extent the Project has been constructed in accordance with the Contract Documents, but the Contract Documents are not in compliance and [GMFB] should not have known of such lack of compliance, [GMFB] shall not be in default hereunder); or

(i)  [GMFB] fails to observe any other term, provision, condition, covenant or agreement contained in this Contract, or reasonably required by Lender, or to be observed and performed by [GMFB], *and [GMFB] fails to promptly cure such default within three (3) days following notice thereof to [GMFB] by [TPG] Owner*.  If such default is not capable of being cured within such 3-day period, [GMFB] shall not be in default provided it has commenced to cure such default within such 3-day period and thereafter diligently and continuously prosecuted such cure to completion within thirty (30) days following the expiration of such 3-day period.

(Emphasis added.)

As is often true in cases involving disputes over complex agreements, TPG Owner and GMFB each assert that their own view of the notice-to-allow-cure provision in subsection 2.4(i) is supported by the unambiguous terms of the Construction Contract.  According to TPG Owner, subsections 2.4(a) through 2.4(h) list specifically defined defaults, while subsection 2.4(i) refers generally to defaults due to GMFB's failure "to observe any *other* term, provision, condition, covenant or agreement contained in [the Construction] Contract." (Emphasis added.)  Under TPG Owner's interpretation, subsection 2.4(i)'s requirement to provide notice and allow a cure period is not a standalone requirement applicable to *all* defaults in

subsections 2.4(a) through 2.4(i). Rather, subsection 2.4(i)'s notice-to-allow-cure requirement applies *only* to defaults identified in subsection 2.4(i), not to the defaults specified in subsections 2.4(a) through 2.4(h). Because it alleged defaults under subsections 2.4(c) through subsection 2.4(h), and not under subsection 2.4(i), TPG Owner argues the requirement that it provide notice and allow a cure period does not apply in this case.

TPG Owner relies on several interpretive canons, including (1) the scope-of-subparts canon, which instructs that "[m]aterial within an indented subpart relates only to that subpart,"[12] (2) the last-antecedent rule, which instructs that "qualifying words, phrases and clauses are to be applied to the words or phrases immediately preceding [them], and are not to be construed as extending to or including others more remote,"[13] (3) the instruction to construe contracts according to their plain language,[14] and (4) the instruction against reading a contract in a way that renders certain words meaningless.[15]

In response, GMFB asserts that the trial court properly construed the notice-to-allow-cure requirement to apply to all contractor defaults listed in

---

[12]     *See Jody James Farms, JV v. Altman Grp., Inc.*, 547 S.W.3d 624, 634 (Tex. 2018).

[13]     *See Certain Underwriters at Lloyd's of London v. Cardtronics, Inc.*, 438 S.W.3d 770, 782 (Tex. App.—Houston [1st Dist.] 2014, no pet.).

[14]     *See N. Shore Energy, L.L.C. v. Harkins*, 501 S.W.3d 598, 602 (Tex. 2016).

[15]     *See Pinto Tech. Ventures, L.P. v. Sheldon*, 526 S.W.3d 428, 443 (Tex. 2017).

section 2.4 of the Construction Contract. Characterizing subsection 2.4(i) as a "catch-all clause," GMFB asserts that the scope-of-subparts canon does not apply and the Court should instead look to the series-qualifier canon. *See Sullivan v. Abraham*, 488 S.W.3d 294, 297 (Tex. 2016) ("When there is a straightforward, parallel construction that involves all nouns or verbs in a series, a prepositive or postpositive modifier normally applies to the entire series."). More specifically, GMFB asserts that the list of specific types of default in subsections 2.4(a) through 2.4(h) followed by a catch-all clause in subsection 2.4(i)—which, according to GMFB, is broad enough to cover those defaults listed in subsections 2.4(a) through 2.4(h) plus other unlisted items—means that notice of a default and a cure period must precede termination for cause based on any default. That is, the catch-all clause incorporated the preceding clauses, as each preceding clause is a term or provision "contained in th[e] [Construction] Contract," and each also duplicated terms and provisions in other parts of the Construction Contract.

GMFB urges that any other interpretation would render subsection 2.4(i) meaningless by allowing TPG Owner to opt into or out of the notice-to-allow-cure requirement through artful wording in a termination letter. GMFB asserts: "The notice-and-cure provision was placed in [sub]section 2.4(i) so it would apply to 'any other term' of the [Construction] Contract, just as inclusive, catch-all clauses are intended to do." In other words, "[r]equiring notice and cure for 'any' breach of the

36

[Construction] Contract requires it for every breach, since 'any' necessarily includes every."

We conclude that TPG Owner's interpretation of the Construction Contract is the proper one and that the notice-to-allow-cure requirement does not apply to the defaults set out in subsection 2.4(a) through 2.4(h), but only to the subsection 2.4(i) defaults. The grammatical structure of section 2.4 confirms this interpretation. It contains nine subparts, each indented and preceded with a letter (a) through (i) and each followed by a line break, signaled in subparts (a) through (h) with a semicolon and in terminal subpart (i) with a period. Although each subpart identifies a situation when GMFB is "in default," a notice-to-allow-cure requirement appears only in subpart (i).[16]

In this regard, the notice-to-allow-cure requirement is structurally constrained to subsection 2.4(i), strongly suggesting that subpart (i) and each of the subparts before it may be understood separately. *See Jama v. Immigration & Customs Enforcement*, 543 U.S. 335, 344 (2005) ("Each clause is distinct and ends with a period, strongly suggesting that each may be understood completely without reading any further."); ANTONIN SCALIA & BRYAN GARNER, READING LAW: THE

---

[16] We note that subpart (a) also includes a form of cure period through its instruction that GMFB shall be in default if it "becomes a subject of any proceedings commenced under any statute or law for the relief of debtors which is *not dismissed within thirty (30) days after commencement*." (Emphasis added.)

INTERPRETATION OF LEGAL TEXTS 162 (2012) ("Periods and semicolons insulate words from grammatical implications that would otherwise be created by the words that precede or follow them."). Otherwise, to read the notice-to-allow-cure requirement in subpart (i) to apply to the defaults specified in subparts (a) through (h), requires jumping over the line breaks. *See Sullivan*, 488 S.W.3d at 297 ("Punctuation is a permissible indicator of meaning.").

This interpretation of the Construction Contract is confirmed even more by the language used in subsection 2.4(i) itself. Subpart (i) does not expressly incorporate the preceding subparts (a) through (h), as done in other provisions imposing notice requirements we discuss below. Subpart (i) requires three-days' notice of default and up to thirty-days' opportunity to cure "such default." The backward reach of "such default" extends only to the first clause in subpart (i), referencing GMFB's failure to "observe any other term, provision, condition, covenant or agreement contained in this [Construction] Contract, or reasonably required by Lender, or to be observed and performed by [GMFB]." *See Certain Underwriters at Lloyd's of London v. Cardtronics, Inc.*, 438 S.W.3d 770, 782 (Tex. App.—Houston [1st Dist.] 2014, no pet.) (relative and qualifying words, phrases and clauses are to be applied to the words or phrases immediately preceding and are not to be construed as extending to or including others more remote).

38

A question then is the meaning of "any other term, provision, condition, covenant or agreement contained in this [Construction] Contract." GMFB asserts that because the specific defaults identified in subparts (a) through (h) are a term or provision "contained in [the Construction] Contract" and also are duplicative of terms and provisions in other parts of the Construction Contract, subpart (i) can only reasonably be read as incorporating the preceding subparts. This, according to GMFB, is because each specific default was also a failure "to observe any other term, provision, condition, covenant or agreement contained in th[e] [Construction] Contract" and so notice and a cure period were required.

In support of its assertion, GMFB emphasizes the word "any," arguing that "notice and cure for 'any' breach of the [Construction] Contract requires it for *every* breach, since 'any' necessarily includes *every*." But this interpretation ignores the next word: "other." The default that is the subject of the notice-to-allow-cure requirement is not simply a failure to observe "*any* . . . term, provision, condition, covenant or agreement" but to observe "any *other* term, provision, condition, covenant or agreement." (Emphasis added.) All the words must be considered. *See, e.g.*, *Cross Timbers Oil Co. v. Exxon Corp.*, 22 S.W.3d 24, 26 (Tex. App.—Amarillo 2000, no pet.). Given its inclusion in subpart (i), after the list of specific defaults in the preceding subparts, "other" must be read as excluding (a) through (h). Otherwise, "other" is meaningless. *See, e.g.*, *J.M. Davidson, Inc. v. Webster*, 128

S.W.3d 223, 229 (Tex. 2003) (courts should avoid construction that renders provisions meaningless). The list of the specific defaults in subparts (a) through (h) would also be meaningless under such an interpretation because, if they are incorporated in subpart (i), it would be unnecessary to separately state them. *See id.*

That the failures identified in subparts (a) through (h) may also be addressed elsewhere in the Construction Contract does not change our view.[17] While there may be some overlap in the provisions of the Construction Contract, that does not prevent the conduct specifically identified in subsections 2.4(a) through 2.4(h) from separately qualifying as a default.

Still other provisions of the Construction Contract support an interpretation of section 2.4 that constrains the notice-to-allow-cure requirement to subpart (i). For instance, the next section of the Construction Contract—section 2.5.1—provides:

> If [GMFB] is in default of this [Construction] Contract after *applicable* notice and cure periods, [TPG] Owner may, upon written notice to [GMFB], terminate [GMFB's] rights under this [Construction] Contract to proceed or continue the Work or any part thereof.

---

[17] GMFB offers five examples of purportedly duplicative provisions, pointing out that (1) a failure to pay subcontractors would violate not only subsection 2.4(c), but also sections 9.1, 12.1.10(c), and 5.5 of the Construction Contract, (2) a failure to comply with federal, state, and local ordinances and regulations would violate not only subsection 2.4(d) and 2.4(h) but also section 3.2.4, (3) a failure to comply with the construction schedule would violate not only subsection 2.4(e) but also section 15.1.5.2, (4) a failure to promptly correct defective materials or work would violate not only subsection 2.4(f) but also section 12.2.1, and (5) a failure to exercise diligence to meet the Completion Date would violate not only subsection 2.4(g) but also section 4.3.

(Emphasis added.) The qualification of "notice and cure periods" with "applicable" signifies there may be no notice-and-cure period at all. *See Applicable*, MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (11th ed. 2014) ("applicable" means "capable of or suitable for being applied"); *Applicable*, BLACK'S LAW DICTIONARY (11th ed. 2019) ("applicable" means "[c]apable of being applied; fit and right to be applied"); *see also In re Davenport*, 522 S.W.3d 452, 457 (Tex. 2017) ("Courts may look to dictionaries to discern the meaning of a commonly used term that the contract does not define."). That is, it provides that TPG Owner may terminate the Construction Contract after notice and cure periods, if any notice and cure periods apply.

GMFB disagrees that "applicable" can mean "if any." According to GMFB, if there is no such notice and cure period, the Construction Contract never says when TPG Owner can terminate the contract. In other words, "without a notice and cure period, the [Construction] Contract neither says nor implies whether [TPG Owner] must terminate promptly or [if it] can wait for years to terminate for a default [that GMFB] may not even [have] know[n] about." But applying the notice-to-allow-cure requirement in the manner that GMFB urges—as applying not just to the defaults identified in subsection 2.4(i) but to the whole of section 2.4—does not solve the problem that GMFB identifies. The notice-to-allow-cure requirement says nothing about when TPG Owner must terminate after an alleged default. We do not find this

41

a reason to reach a different conclusion about the applicability of the notice-to-allow-cure requirement.

A comparison of section 2.4 and the provision authorizing GMFB's termination of the Construction Contract also supports an interpretation of section 2.4 constraining the notice-to-allow-cure requirement to subpart (i). Sections 14.1.1 and 14.1.2 of the Construction Contract, respectively, authorized GMFB to terminate the Construction Contract if (1) the Work was stopped for a period of thirty consecutive days for certain specified reasons out of its control or (2) repeated suspensions, delays or interruptions of the Work by TPG Owner "aggregate more than 100 percent of the total number of days scheduled for completion, or 120 days in any 365-day period, whichever is less." Section 14.1.3 imposes a seven-day notice requirement for termination "[i]f one of the reasons described in [s]ection 14.1.1 or 14.1.2 exists." Language like that used in section 14.1.3, which expressly makes the notice requirement applicable to both of its preceding subparts, is absent from section 2.4(i).

In addition, section 14.1.4 of the Construction Contract allows GMFB to terminate if the Work is stopped "for a period of [sixty] consecutive days" because TPG Owner "has repeatedly failed to fulfill [its] obligations under the Contract Documents with respect to matters important to the progress of the Work." Like section 2.4(i), this provision includes its own notice requirement: "upon seven

additional days' written notice to [TPG] Owner, [GMFB may] terminate the [Construction] Contract and recover from [TPG] Owner as provided in section 14.1.3." And thus it also supports an interpretation constraining the notice-to-allow-cure requirement to subsection 2.4(i) in the Construction Contract.

We disagree that such an interpretation would render illusory the clause allowing GMFB to correct defects up to one year after substantial completion. Section 12.2.2.1 of the Construction Contract provides that "if, within one year after the date of Substantial Completion of the Work . . . any of the Work is found to be not in accordance with the requirements of the Contract Documents, [GMFB] shall correct it promptly after receipt of written notice from [TPG] Owner to do so unless [TPG] Owner has previously given [GMFB] a written acceptance of such condition." A reading constraining section 2.4's notice-to-allow-cure requirement to subpart (i) is not inconsistent with this provision. The two may be harmonized by looking to section 2.5.1, which recognizes that a termination for cause based on a default is a termination of GMFB's "rights under [the Construction] Contract to proceed or continue the Work or any part thereof."

We also consider GMFB's caution to avoid a construction of the notice-to-allow-cure requirement that would unreasonably convert every construction defect into a contractual default. Our construction will not do this. No matter if the notice-to-allow-cure requirement applies only to subpart (i) of section

2.4 or also to subparts (a) through (h), only those construction defects that fall within the failures identified in section 2.4 qualify as defaults.

Finally, we disagree with GMFB that our construction of the notice-to-allow-cure requirement achieves a forfeiture. GMFB correctly points out that "[f]orfeitures are not favored in Texas, and contracts are construed to avoid them." *Aquaplex, Inc. v. Rancho La Valencia, Inc.*, 297 S.W.3d 768, 774 (Tex. 2009). But the parties here expressly agreed to allow termination of the Construction Contract for the defaults set out in section 2.4, which come with clear consequences upon a proper election by TPG Owner to terminate the Construction Contract for cause. There are contractually-specified-default remedies. TPG Owner's damages are defined to include "actual damages, together with any increased costs to [TPG] Owner to achieve final completion and the cost of any delay resulting from [GMFB's] default." And GMFB is not entitled to receive any payment "until final completion and after [TPG] Owner has assessed and charged [GMFB] for costs and damages for which [GMFB] shall be liable to [TPG] Owner pursuant to the Contract Documents." In this regard, payment to GMFB may be delayed and reduced, but it is not necessarily forfeited. Under these circumstances, the Construction Contract can be enforced as written.

We thus conclude that the notice-to-allow-cure requirement in section 2.4 does not apply to the defaults set out in subsections 2.4(a) through 2.4(h), but only

44

to subsection 2.4(i). And we conclude that the trial court erred in determining that TPG Owner had to comply with the notice-to-allow-cure requirement to terminate GMFB for cause based on the alleged defaults under subsections 2.4(c) through 2.4(h).

2. **The error in interpreting subsection 2.4(i)'s notice-to-allow-cure requirement is reversible**

Although we have held that the trial court's interpretation of the notice-to-allow-cure requirement in subsection 2.4(i) was erroneous, we must still consider whether the error is reversible. *See* TEX. R. APP. P. 44.1(a) (judgment is not reversible on ground that "trial court made an error of law" unless complained-of error (1) probably caused rendition of improper judgment or (2) probably prevented appellant from properly presenting its appeal).

In another portion of its first issue, TPG Owner argues that the trial court's contract-interpretation error is reversible because it led the trial court to erroneously render judgment against TPG Owner on its claim for breach of the Construction Contract and its request for the contractually-specified default damages. GMFB responds that the trial court's contract-interpretation error is not reversible because the judgment would be the same even if notice and cure were not required. *See BMC Software*, 83 S.W.3d at 794 ("If the reviewing court determines a conclusion of law is erroneous, but the trial court rendered the proper judgment, the erroneous conclusion of law does not require reversal.").

45

We do not agree with GMFB that the contract-interpretation error is harmless and so not reversible. In support of its harmless-error assertion, GMFB relies on certain findings of the trial court that TPG Owner itself breached the Construction Contract—findings which TPG Owner does not challenge on appeal. These include the findings that:

- GMFB "was to be solely responsible for, and have control over, construction means, methods, techniques, sequences, and procedures for coordinating all portions of the Work under the [Construction] Contract," yet "TPG Owner's representatives . . . Donnelly and . . . Harris interfered with the means and methods of construction by ordering multiple inspections, communicating directly to subcontractors, directing which subcontractors should be hired, and exercising control over those subcontractors and the methods in which they worked."

- TPG Owner directed GMFB or its subcontractors or both "to perform work that was beyond the scope of the Construction Contract," and its representatives "confirmed through emails that the Change Orders were authorized, but did not sign them."

- Although unsigned, the "Change Orders were valid."

- The considerable delays encountered on the Project were "attributable to both parties" and to other "factors outside [their] control."

- Termination "excused GMFB from further performance under the contract."

According to GMFB, it was the prevailing party under the Construction Contract "because TPG Owner breached the [Construction] Contract" and "that one of its

46

breaches was failure to give notice and a chance to cure did not invalidate any of the several other grounds."

But each party had its own breach-of-contract claim under the Construction Contract. And TPG Owner's first issue on appeal concerns *its* claim under the Construction Contract for the contractually-specified damages based on GMFB's alleged defaults, not GMFB's claim based on the uncontested breaches of the Construction Contract by TPG Owner. While the uncontested breaches by TPG Owner might present alternative grounds to affirm the trial court's findings on GMFB's claim for breach of the Construction Contract, the uncontested breaches by TPG Owner will not avoid a conclusion that the trial court's contract-interpretation error probably caused the rendition of an improper judgment as to TPG Owner's breach-of-contract claim unless at least one of those breaches excused the GMFB defaults raised by the pleadings and evidence. *See, e.g.*, *Mustang Pipeline Co., Inc. v. Driver Pipeline Co.*, 134 S.W.3d 195, 196 (Tex. 2004) (holding one party's prior material breach excused other party's further performance). Otherwise, both parties maintain breach-of-contract claims under the Construction Contract.

The excuse identified by GMFB in its appellate briefing is its affirmative defense of prior material breach. *See Bartush-Schnitzius Foods Co. v. Cimco Refrigeration, Inc.*, 518 S.W.3d 432, 436–37 (Tex. 2017) (discussing prior-material-breach defense); *Henry v. Masson*, 333 S.W.3d 825, 834 (Tex.

App.—Houston [1st Dist.] 2010, no pet.) (prior material breach is affirmative defense). The significance of a prior material breach is that it excuses the non-breaching party from continuing to perform the contract. *Mustang Pipeline*, 134 S.W.3d at 196. By contrast, if a breach is immaterial, "the non-breaching party is not excused from future performance but may sue for damages caused by the breach." *Levine v. Steve Scharn Custom Homes, Inc.*, 448 S.W.3d 637, 654 (Tex. App.—Houston [1st Dist.] 2014, pet. denied). The materiality of a breach generally presents a dispute for resolution by the trier of fact. *Henry*, 333 S.W.3d at 835; *see also Mustang Pipeline*, 134 S.W.3d at 199 (identifying seven-factor test for materiality of breach).

Although the parties requested findings on which breached first, the trial court did not make any express finding about GMFB's prior-material-breach defense. Thus, to hold, as GMFB, suggests would require us to presume a finding that GMFB prevailed on its prior-material-breach defense, as GMFB urges we must do under Texas Rule of Civil Procedure 299. *See* TEX. R. CIV. P. 299. That rule provides:

> The judgment may not be supported upon appeal by a presumed finding upon any ground of recovery or defense, no element of which has been included in the findings of fact; but when one or more elements thereof have been found by the trial court, omitted unrequested elements, when supported by evidence, will be supplied by presumption in support of the judgment.

TEX. R. CIV. P. 299. Emphasizing the rule's second clause, GMFB asserts we must presume findings in its favor at least from the trial court's finding that TPG Owner's

48

representatives Harris and Donnelly interfered with GMFB's performance by dictating numerous means and methods inconsistent with GMFB's planned approach from the beginning of the Project.

Even so, Texas Rule of Civil Procedure 299 "does not permit a finding to be presumed when such finding was requested and refused by the trial judge." *Chapa v. Reilly*, 733 S.W.2d 236, 237 (Tex. App.—Corpus Christi–Edinburg 1986, writ ref'd n.r.e.) (holding court would not presume findings on essential elements of cause of action or defense under rule 299 when findings were requested and refused); *see also Vickery v. Comm'n for Lawyer Discipline*, 5 S.W.3d 241, 253 (Tex. App.—Houston [14th Dist.] 1999, writ denied) ("[W]here the trial court has been specifically requested to make a particular finding in support of its judgment and it fails to do so, the failure is tantamount to a refusal[.]"). In addition, while the trial court's findings that GMFB relies on concern GMFB's claim that TPG Owner breached the Construction Contract, they are not necessarily referrable to GMFB's prior-material-breach defense and do not answer questions of the materiality of the breaches or the effect, if any, of GMFB's election to continue work on the Project despite the interference from TPG Owner's representatives. *See Bartush-Schnitzius*, 518 S.W.3d at 436 (elements of contract claim require finding of breach, not finding of material breach); *Levine*, 448 S.W.3d at 654 (when party commits non-material breach, other party "is not excused from future performance but may sue for the

49

damages caused by the breach"). In sum, we may not presume a finding of excuse on this record that would avoid a conclusion that the trial court's error in interpreting the notice-to-allow-cure requirement was harmless. *See Guridi v. Waller*, 98 S.W.3d 315, 317 (Tex. App.—Houston [1st Dist.] 2003, no pet.); *see also* TEX. R. APP. P. 44.1(a).

Because of its error of contract interpretation, the trial court concluded that TPG Owner "improperly terminated [GMFB] for cause" and it did not make any findings on the alleged GMFB defaults under subsections 2.4(c) through 2.4(h) of the Construction Contract, even though the issue was raised by the pleadings and evidence and such findings were requested. Further, based on its finding that TPG Owner failed to satisfy subsection 2.4(i)'s notice-to-allow-cure requirement as to the alleged defaults under subsections 2.4(c) through 2.4(h), the trial court concluded that TPG Owner terminated GMFB for convenience, making the contractually-specified default remedies unrecoverable. On this record then, we hold that the trial court's contract-interpretation error did cause the rendition of an improper judgment, and a new trial is required on TPG Owner's claim for breach of the Construction Contract based on GMFB's alleged defaults under the Construction Contract. *See* TEX. R. APP. P. 44.1(a).

50

We sustain TPG Owner's first issue.[18]

### 3. Error on the refusal to make findings as to GMFB's alleged breaches of the Construction Contract is also reversible

In its second issue, TPG Owner argues that the trial court erred in rendering judgment in favor of GMFB on TPG Owner's claim for breach of the Construction Contract because the trial court refused to make findings on whether GMFB breached the Construction Contract and "the evidence at least raised a fact issue on whether GMFB breached the Construction Contract." According to TPG Owner, the same evidence of GMFB's defaults is evidence of GMFB's breaches of the Construction Contract and the trial court's refusal to make findings then was reversible error because it precluded TPG Owner from recovering common-law benefit-of-the-bargain damages. Thus, although the conduct that gave rise to the claims is the same, TPG Owner asserts a claim for benefit-of-the-bargain damages under the common law based on GMFB's alleged breaches of the Construction Contract along with its claim for the contractually-specified damages for GMFB's alleged defaults. This is permitted by section 2.6 of the Construction Contract, which provided that TPG Owner's contractual remedies for default were "in addition to and not in limitation of any other rights of [TPG] Owner granted in the Contract Documents or at law or in equity."

---

[18] To the extent that TPG Owner makes other arguments in support of its first issue, we need not address them. *See* TEX. R. APP. P. 47.1.

51

The record shows that TPG Owner made requests for additional, omitted, and amended findings on the issue of GMFB's breach of the Construction Contract and that the issue was raised by the pleadings and evidence. For instance, even viewing the evidence in the light most favorable to GMFB, TPG Owner presented evidence that it asked GMFB to remove moldy lumber and repair waterproofing errors and that, about three months later, the waterproofing repairs had not been corrected. This evidence raised a fact issue as to whether GMFB breached the Construction Contract by failing to promptly correct defective work and remove defective materials or by failing to enclose and protect material stored at the Project from rain to avoid mold.[19] But the trial court did not make findings on the alleged breaches of the Construction Contract by GMFB.

---

[19] Although we have noted the evidence raising a fact issue as to GMFB's alleged breaches, we do not make any determination of whether the evidence of GMFB's breaches was conclusive. TPG Owner does not assert that the evidence was conclusive as to its unliquidated damages for breach of the Construction Contract. Nor would the record support such a contention. Thus, even if TPG Owner established GMFB's breaches of the Construction Contract as a matter of law, the issue of TPG Owner's unliquidated damages would remain unresolved. A case cannot be remanded to the trial court for a new trial solely on the issue of unliquidated damages when, as here, liability is contested. *See* TEX. R. APP. P. 44.1(b) ("The court may not order a separate trial solely on unliquidated damages if liability is contested."); *Pointe West Ctr., LLC v. It's Alive, Inc.*, 476 S.W.3d 141, 150 (Tex. App.—Houston [1st Dist.] 2015, pet. denied) ("When liability is contested, courts may not grant a new trial on unliquidated damages solely."). It is therefore unnecessary to determine whether the evidence is conclusive because any remand to the trial court must be as to both liability and damages for TPG Owner's breach-of-contract claim. *See* TEX. R. APP. P. 47.1.

GMFB responds that such findings were unnecessary because the trial court found in favor of GMFB on the competing claims for breach of the Construction Contract and "when each party claims the other breached a contract, a finding *for* one side is necessarily a finding *against* the other." But this response again rests on a presumed finding on GMFB's prior-material-breach defense, an assertion that we have rejected in our analysis above. As we concluded about the trial court's refusal to make findings as to GMFB's alleged defaults under the Construction Contract, we cannot presume that the trial court found facts necessary to support and uphold its judgment against TPG Owner as to GMFB's alleged breaches of the Construction Contract. *See Nat'l Commerce Bank v. Stiehl*, 866 S.W.2d 706, 707 (Tex. App.—Houston [1st Dist.] 1993, no writ) (stating appellate court could not presume findings to support trial court's judgment when party requested additional, omitted, and amended findings on ultimate issues raised by pleadings and evidence and necessary to understand trial court's judgment). We hold the trial court erred in rendering judgment in favor of GMFB on TPG Owner's claim for breach of the Construction Contract because the trial court refused to make findings on whether GMFB breached the Construction Contract.

We sustain TPG Owner's second issue.

53

## B.    GMFB's claim under the Construction Contract

In its fourth issue, TPG Owner argues that the trial court erred in rendering judgment in favor of GMFB on GMFB's claim for breach of the Construction Contract because if, as we have determined, its claim for damages for GMFB's alleged default of the Construction Contract must be retried, then GMFB's claim for TPG Owner's breach of the Construction Contract must also be retried "because the measure of damages on that GMFB claim will be different if it is determined on retrial that GMFB was properly terminated for cause/default."[20]  In response, GMFB asserts that even if a new trial is required, it was entitled to any unpaid Cost of the Work and unpaid Contractor's Fee no matter if it was terminated for cause or for convenience.  We agree with TPG Owner that our holding that the trial court misinterpreted subsection 2.4(i)'s notice-to-allow-cure requirement requires a new trial on GMFB's claim for TPG Owner's breach of the Construction Contract.

The Construction Contract provided in section 14.4.3 that if TPG Owner terminated the Construction Contract for convenience, GMFB, "as its sole remedy," was "entitled to receive payment for Work executed, and costs incurred by reason of such termination, as set forth below, but in no event in excess of the Contract

---

[20]    In its fourth issue, TPG Owner includes a second, alternative argument that even if the trial court applied the correct measure of damages, a new trial is still required because the evidence was not legally or factually sufficient to support the amount awarded.  Due to our disposition below, we need not address this argument.  *See* TEX. R. APP. P. 47.1.

Sum."[21] But if TPG Owner terminated GMFB's right under the Construction Contract to proceed or continue with the Work based on an alleged default under section 2.5, GMFB was not entitled to receive any payment that it claimed "until final completion and after [TPG Owner] . . . assessed and charged [GMFB] for costs and damages for which [GMFB was] liable to [TPG Owner] pursuant to the Contract Documents."

Under this latter provision, if the fact finder determines on remand to the trial court that TPG Owner properly terminated GMFB for cause based on a default, any amount due to GMFB under the Construction Contract would be contractually reduced by the costs and damages, if any, for which GMFB may be found liable to TPG Owner under the Construction Contract. The issue of TPG Owner's undecided claim based on GMFB's alleged default of the Construction Contract is thus intertwined with GMFB's claim based on TPG Owner's breaches of the Construction Contract, requiring a new trial on both claims. *See* TEX. R. APP. P. 44.1(b); *see also Flying Diamond-West Madisonville Ltd. P'ship v. GW Petroleum, Inc.*, No. 10-07-00281-CV, 2009 WL 2707405, at \*15 (Tex. App.—Waco Aug. 26,

---

[21] The "Contract Sum" is contractually defined as "the actual Cost of the Work as defined in Article 7 plus the Contractor's Fee." Article 7 defines the "Cost of Work" to mean "costs necessarily incurred by [GMFB] in the proper performance of the work."

2009, no pet.) (mem. op.) (remanding entire case because issues that required reversal were interwoven with and not clearly separable from remainder).

Moreover, even though TPG Owner has not disputed on appeal that it breached the Construction Contract, the remand to the trial court cannot be limited to only GMFB's damages because the appellate rules prohibit a trial on damages alone when, as here, liability was contested. *See* TEX. R. APP. P. 44.1(b) ("The court may not order a separate trial solely on unliquidated damages if liability is contested."); *Pointe West Ctr., LLC v. It's Alive, Inc.*, 476 S.W.3d 141, 150 (Tex. App.—Houston [1st Dist.] 2015, pet. denied) ("When liability is contested, courts may not grant a new trial on unliquidated damages solely."). Thus, we hold that a new trial is required as to both liability and damages on GMFB's claim for TPG Owner's breach of the Construction Contract.

We sustain TPG Owner's fourth issue on appeal.

## C. Reimbursement of reasonable out-of-pocket expenses

Section 15.6.2 of the Construction Contract provides that the party who prevails in litigation "shall be reimbursed by the non-prevailing party for all of the prevailing party's reasonable out-of-pocket expenses incurred in connection therewith, including without limitation reasonable attorney's fees[.]" The trial court determined that GMFB was the prevailing party for purposes of section 15.6.2 and

awarded GMFB $3,620,306.62 as its "reasonable out-of-pocket expenses, including attorney's fees and costs[.]"

Both TPG Owner and GMFB challenge the trial court's application of section 15.6.2 of the Construction Contract. In its third and fifth issues, TPG Owner argues that because it should have been the prevailing party on the competing claims for breach of the Construction Contract, the trial court should not have awarded any attorney's fees to GMFB, and the trial court should have awarded attorney's fees to TPG Owner instead. In its second issue on cross-appeal, GMFB argues that, although it was the prevailing party on the competing claims for breach of the Construction Contract, the trial court erred in awarding GMFB only its attorney's fees. That is, GMFB asserts that it was entitled to reimbursement under the Construction Contract of not only its attorney's fees but also its out-of-pocket expenses, including the amounts it paid to third-party vendors for services associated with depositions, other discovery, and expert testimony.

Given our holdings that both TPG Owner's and GMFB's claims for breach of the Construction Contract must be retried, neither party has prevailed under the Construction Contract and their respective claims for reimbursement under section 15.6.2 must be retried with the issues of liability and damages. *See, e.g.*, *Strebel v. Wimberly*, 371 S.W.3d 267, 285 (Tex. App.—Houston [1st Dist.] 2012, pet. denied) (reversing and remanding award of attorney's fees because court reversed and

57

remanded claim supporting attorney's fees). Thus, without reaching TPG Owner's third or fifth issues or GMFB's second issue on cross-appeal, we remand to the trial court TPG Owner's and GMFB's respective claims for reimbursement under section 15.6.2 of the Construction Contract for a new trial.

**LLC Agreement and Guaranty**

In its sixth and seventh issues, TPG 2011-4 argues that the trial court, after properly finding that TPG 2011-4 was the prevailing party on its claims for breach of the LLC Agreement and the Guaranty, erred in awarding an insufficient amount of damages against GPO and Eeds as Construction Cost Overruns because the trial court misconstrued the LLC Agreement to limit the Construction Cost Overruns to those incurred before TPG Owner terminated GMFB under the Construction Contract, rather than as including all cost overruns for the entire Project. In its eighth issue, TPG 2011-4 argues that the trial court erred in refusing to award it attorney's fees against Eeds under section 8.6 of the Guaranty because section 8.6 provided that Eeds would pay all "reasonable attorney's fees . . . reasonably incurred in any effort to enforce any term of th[e] Guaranty."

In their first and third issues on cross-appeal, GPO and Eeds argue that the trial court erred in awarding Construction Cost Overruns and attorney's fees to TPG 2011-4 on TPG 2011-4's claims for breach of the LLC Agreement and the Guaranty because the trial court did not "apply [an] available $1 million Contingency" which

58

"the parties set aside as a line item specifically to cover [situations] like this" and the trial court awarded TPG 2011-4 "too much" in attorney's fees against GPO.[22]

## A. TPG 2011-4's claim for Construction Cost Overruns

The trial court determined that TPG 2011-4 was the prevailing party on its claims for breach of the LLC Agreement and Guaranty, concluded that GPO and Eeds were jointly and severally liable for $647,717.13 in Construction Cost Overruns, and ordered GPO to pay TPG 2011-4 an additional $2,565,526 in attorney's fees and expenses. The trial court did not order Eeds to pay any of TPG 2011-4's costs and expenses.

### 1. The LLC Agreement does not require GPO to pay Construction Cost Overruns incurred after GMFB's termination

In its sixth and seventh issues, TPG 2011-4 argues that the trial court erred in misconstruing the LLC Agreement to limit the Construction Cost Overruns to those incurred before TPG Owner terminated GMFB under the Construction Contract because it should have included all cost overruns for the entire Project. Thus, the trial court awarded it an insufficient amount as Construction Cost Overruns against

---

[22] GPO also asserted a claim against TPG 2011-4 under the LLC Agreement for failure to keep proper books and records. The trial court concluded that this claim failed because GPO did not prove that "such a breach caused it damages," and ordered that "GPO . . . take nothing under the [LLC] Agreement" in its final judgment. GPO has not complained about the denial of its claim under the LLC Agreement on appeal. *See* TEX. R. APP. P. 38.1(f).

GPO under the LLC Agreement and against Eeds based on his guaranty of GPO's obligation to pay Construction Cost Overruns.

After examining the LLC Agreement and analyzing the arguments presented, we disagree with TPG 2011-4 that the LLC Agreement holds GPO liable for Construction Cost Overruns incurred after GMFB's termination under the Construction Contract. We first note the trial court's conclusion that the LLC Agreement is governed by Delaware Law—a conclusion neither party challenges on appeal. Thus, we apply Delaware law to interpret the LLC Agreement. *See Maxus Energy Corp. v. Occidental Chem. Corp.*, 244 S.W.3d 875, 878 (Tex. App.—Dallas 2008, pet. denied); *Brown v. Pennzoil-Quaker State Co.*, 175 S.W.3d 431, 435 (Tex. App.—Houston [1st Dist.] 2005, pet. denied). We will still apply Texas standards of appellate review, however, including the de novo standard for questions for law. *See Maxus Energy Corp.*, 244 S.W.3d at 878; *Brown*, 175 S.W.3d at 435.

"[Delaware] courts interpreting a contract will give priority to the parties intentions as reflected in the four corners of the agreement, construing the agreement as a whole and giving effect to all its provisions." *In re Viking Pump, Inc.*, 148 A.3d 633, 648 (Del. 2016); *see also Kuhn Constr., Inc. v. Diamond State Port Corp.*, 990 A.2d 393, 396–97 (Del. 2010) ("We will read a contract as a whole and we will give each provision and term effect, so as not to render any part of the contract mere surplusage."); *Eugene A. Delle Donne & Son, L.P. v. Applied Card Sys., Inc.*, 821

60

A.2d 885, 887 (Del. 2003) ("In construing a contract, the document must be considered as a whole[.]"). Courts will afford a contract's clear and unambiguous terms their ordinary and usual meaning. *Allied Capital Corp. v. GC-Sun Holdings, L.P.*, 910 A.2d 1020, 1030 (Del. Ch. 2006).

In asserting that GPO had to pay all Construction Cost Overruns for the entire Project, including those incurred after GMFB was terminated under the Construction Contract, TPG 2011-4 looks to section 6.3 of the LLC Agreement. That section provides that "[a]ll Construction Cost Overruns, after the application of available contingencies . . . , will be paid by [GPO]." Emphasizing the presence of the adjective "all" before Construction Cost Overruns that "will be paid" by GPO as well as the LLC Agreement's commercial purpose related to the development of the entire Project,[23] TPG 2011-4 asserts that section 6.3's scope cannot be restricted "only to Construction Cost Overruns incurred *before* GMFB was terminated as contractor under the Construction Contract."

As TPG 2011-4 asserts, the "definition of 'all' is well known, and means 'the whole amount, quantity, or extent of.'" *Great Hill Equity Partners IV, LP v. SIG Growth Equity Fund I, LLLP*, 80 A.3d 155, 158 (Del. Ch. 2013). But the question is "the whole amount, quantity, or extent of" what? The answer must be of the

---

[23] *See Chi. Bridge & Iron Co. N.V. v. Westinghouse Elec. Co.*, 166 A.3d 912, 827 (Del. 2017) ("The basic business relationship between the parties must be understood to give sensible life to any contract.").

Construction Cost Overruns, as specifically defined in the LLC Agreement to mean the "amount by which the actual cost of the Land acquisition and the Construction Work exceeds the Construction Budget, if any." *See AT&T Corp. v. Lillis*, 953 A.2d 241, 253 (Del. 2008) (Delaware law requires contractual terms to be given their plain and ordinary meaning absent specific definition provided in contract). Construction Work is also contractually defined. It means "all construction work and site work required to be performed by [GMFB] in connection with the Construction of the Proposed Development, as set forth in the Construction Contract."

As GPO and Eeds point out, the definition of Construction Work includes only the work "required to be performed by [GMFB] . . . as set forth in the Construction Contract," and any work the Construction Contract did not require GMFB to perform was not part of the Construction Work and thus did not contribute to Construction Cost Overruns. The Construction Contract—which the parties and we agree should be read together with the LLC Agreement—does not require or even permit GMFB to perform work after termination, no matter if GMFB is terminated for cause based on a default or for convenience.[24] *See* RESTATEMENT

---

[24] The section of the Construction Contract addressing termination for cause based on a contractor default—section 2.5.1—provides that "[i]f [GMFB] is in default . . . , [TPG] Owner may . . . terminate [GMFB's] right under th[e] [Construction] Contract to *proceed or continue the Work or any party thereof.*" (Emphasis added.) And the section of the Construction Contract addressing termination for convenience—section 14.4.2—similarly contemplates the cessation of work by GMFB after termination. It provides that upon receipt of written notice

(SECOND) OF CONTRACTS §202(2) ("A writing is interpreted as a whole, and all writings that are part of the same transaction are interpreted together."). We agree with GPO and Eeds that "the general definition of the adjective 'all' cannot change the specific definition of 'Construction Cost Overruns' to which the parties agreed." Because GMFB had to perform no work under the Construction Contract after termination, section 6.3 cannot be read as requiring GPO to pay Construction Cost Overruns after GMFB's termination.

We are not persuaded that a more expansive interpretation of GPO's liability for Construction Cost Overruns is required by other provisions of the LLC Agreement. For instance, we do not find that reading section 6.3 of the LLC Agreement together with section 9.17 requires a different interpretation. Section 9.17 provides:

> Guaranties. [GPO] shall guaranty completion of construction and shall provide any completion and/or recourse carveout guaranties and environmental indemnities required in connection with the Construction Loan and/or the Mezzanine Loan. If [TPG 2011-4] or an Affiliate of [TPG 2011-4] is required to provide any such guaranty or indemnity, the economic detriment of each Guaranty shall be borne by [GPO]; . . . . In furtherance of, but subject to, the foregoing, (a) if [TPG 2011-4] makes a payment under a Member Guaranty, then [GPO] [sic] promptly pay [TPG 2011-4] the amount of such payment, and (b) if an Affiliate of [TPG 2011-4] makes a payment under an Affiliate Guaranty, then [GPO] shall promptly pay the Affiliate guarantor the amount of such payment. Amounts paid under or with respect to a

---

from TPG Owner of a termination for convenience, GMFB "shall . . . cease operations as directed by [TPG] Owner in the notice."

63

Member Guaranty or an Affiliate Guaranty shall not be deemed a Capital Contribution.

TPG 2011-4 urges that GPO's promises in section 9.17—to (1) "guaranty completion of construction" and (2) "promptly pay [] the amount of [any] payment" that TPG 2011-4 or any affiliate of TPG 2011-4 makes to project lenders—rendered GPO financially responsible for project completion, meaning "the only reasonable reading of [section] 6.3 is that . . . GPO promised to pay *all* Construction Cost Overruns on the *entire* Project." (First and second alterations in original.) (Internal quotations omitted.) But section 9.17 does not answer who would pay to complete construction, and it cannot be read so broadly as to include a promise by GPO to guarantee completion after termination of GMFB. The specific clauses in the Construction Contract suggesting that GMFB may not complete construction after termination must prevail over the general clause guaranteeing completion. *See generally DCV Holdings, Inc. v. ConAgra, Inc.*, 889 A.2d 954, 961 (Del. 2005) ("Specific language in a contract controls over general language, and where specific and general provisions conflict, the specific provision ordinarily qualifies the meaning of the general one.").

The recitals in the LLC Agreement also do not compel a different interpretation. According to TPG 2011-4, the LLC Agreement recitals stating that TPG 2011-4 and GPO's joint-venture entity, TPG Mezzanine, will develop the acquired land as well as "develop, construct, own, lease, manage, and operate" the

64

Project support a conclusion that the purpose of the LLC Agreement was to develop the entire Project, and thus the trial court adopted an unreasonable interpretation by limiting the recoverable Construction Cost Overruns to only part of the Project. But recitals do not establish a substantive obligation. *See Glidepath Ltd. v. Beumer Corp.*, C.A. No. 12220-VCL, 2019 WL 855660, at *16 (Del. Ch. Feb. 21, 2019) (not published) (generally recitals "are not a necessary part of a contract and can only be used to explain some apparent doubt with respect to the intended meaning of the operative or granting part of the instrument" but recitals do not control if they are "inconsistent with the operative or granting part" and do not "establish a substantive obligation").

We conclude that the LLC Agreement does not require GPO to pay Construction Cost Overruns incurred after GMFB's termination. Thus, we hold that the trial court did not err by limiting the Construction Cost Overruns to those incurred before GMFB was terminated under the Construction Contract.

We overrule TPG 2011-4's sixth issue.

Our conclusion rejecting an interpretation of section 6.3 of the LLC Agreement that would require GPO to pay Construction Cost Overruns incurred after GMFB's termination also disposes of TPG 2011-4's seventh issue. This is because TPG 2011-4's argument in the seventh issue is that the "award of Construction Cost Overruns against Eeds under the Guaranty is wrong . . . for all the

same reasons . . . that the award of Construction Cost Overruns against GPO under the [LLC] Agreement is wrong[.]" Because Eeds guaranteed GPO's "obligation to pay 'Construction Cost Overruns,' as defined in the [LLC Agreement], pursuant to [s]ection 6.3," the extent of his liability is commensurate with GPO's under the LLC Agreement.[25] Because the LLC Agreement does not require GPO to pay Construction Cost Overruns incurred after GMFB's termination, we hold that Eeds's guarantee does not include an obligation to pay Construction Cost Overruns incurred after GMFB's termination.

We overrule TPG 2011-4's seventh issue.

### 2. The Construction Cost Overruns are not recoverable against GPO or Eeds

We must next address the first issue on cross-appeal of GPO and Eeds because our holding on that issue dispose of the remaining issues in both the TPG Parties' appeal and the Greystone Parties' cross-appeal.

In their first issue on cross-appeal, GPO and Eeds argue that the trial court erred in awarding any Construction Cost Overruns to TPG 2011-4 because the $647,717.13 for Construction Cost Overruns found by the trial court is not

---

[25] The extent of Eeds's liability under the Guaranty is governed by the terms of the Guaranty and the parties' choice of law. The Guaranty provides in section 8.1 that it "shall be governed and construed in accordance with California law." Under California law, "the liability of a surety is commensurate with that of the principal," and thus, "where the principal is not liable on the obligation, neither is the guarantor." *U.S. Leasing Corp. v. duPont*, 444 P.2d 65, 75 (Cal. 1968).

recoverable. They assert the estimated budget for the construction of the Project included a contingency amount, the unused portion of which exceeded the Construction Cost Overruns at the time of GMFB's termination and, by the clear and unambiguous terms of the LLC Agreement, should have been applied to reduce any liability of GPO to zero. They also assert that because GPO was not liable under the LLC Agreement for Construction Cost Overruns, neither was Eeds under the Guaranty. We agree.

More than one of the findings and conclusions pertinent to this issue are unchallenged on appeal. These include (1) the trial court's finding that the estimated budget for the construction of the Project—the Control Estimate defined to "include the estimated Cost of the Work plus the Contractor's Fee"—included $1,460,173 in Hard Cost Contingency and (2) the trial court's conclusion that, at the time of GMFB's termination, the unexpended Hard Cost Contingency was $1,026,161.01. Given these unchallenged findings and conclusions, there is no dispute that the amount of the unexpended Hard Cost Contingency exceeded the amount of the Construction Cost Overruns found by the trial court.

Section 5.2.6 of the Construction Contract provided that the contingency line item in the Controlled Estimate "shall be used to pay for additional costs incurred by [GMFB] for its performance of the Work for which additional costs may not have been included in the Control Estimate." The LLC Agreement, as described above,

defined "Construction Cost Overruns" as the "amount by which the actual cost of the Land acquisition and the Construction Work exceed[ed] the Construction Budget," and instructed that any unused contingency should be applied in determining the Construction Cost Overruns payable by GPO. Reading these provisions together, we conclude that the LLC Agreement clearly and unambiguously required GPO to pay only the Construction Cost Overruns that remained after application of the unexpended contingency, which in this case was none given that the unexpended contingency exceeded the amount of the cost overruns.

The trial court declined to apply the unused contingency per the LLC Agreement's requirement, concluding that it would be "inequitable to allow either party the benefit of any unused portions of the Hard Cost Contingency" because the LLC Agreement did not "contemplate a termination of the Construction Contract for convenience." But equity was not a valid basis for disregarding the LLC Agreement's requirement. *See Heartland Del. Inc. v. Rehoboth Mall Ltd. P'ship*, 57 A.3d 917, 925 (Del. Ch. 2012) (observing "[e]quity respects the freedom to contract" and "if contract rights were only to be enforced upon a balancing of the equities, mischief would result far greater than is imposed, on occasion, by letting parties order their own affairs"); *see also Gertrude L.Q. v. Stephen P.Q.*, 466 A.2d 1213, 1217 (Del. 1983) (courts cannot make new contract for parties). Moreover, the LLC

68

Agreement's requirement to reduce Construction Cost Overruns by unexpended contingency was not conditional on the nature of GMFB's termination. As we have already concluded, it clearly and unambiguously stated that GPO would pay Construction Cost Overruns "after the application of available contingencies."

Although it agrees that the trial court erroneously applied equity to rewrite the LLC Agreement, TPG 2011-4 asserts that "the trial court's resort to equity was driven by the . . . contract-interpretation error" limiting the cost overruns only to those accrued when GMFB was terminated as a contractor under the Construction Contract, rather than determining cost overruns on the entire Project. We have already rejected this argument in interpreting section 6.3 of the LLC Agreement to not require GPO to pay Construction Cost Overruns incurred after GMFB's termination.

In sum, having found that the Construction Cost Overruns without applying the contingency were $647,717.13 and that the unexpended contingency was $1,026,161.01, the plain meaning of the LLC Agreement requires a conclusion that no cost overruns were recoverable from GPO when the latter is subtracted from the former. In addition, because the Guaranty does not set forth a more extensive liability than GPO's under the LLC Agreement, Eeds also was not liable for cost overruns under the LLC Agreement. *See U.S. Leasing Corp. v. duPont*, 444 P.2d

65, 75 (Cal. 1968). We thus hold that the trial court erred in awarding cost overruns against GPO under the LLC Agreement and against Eeds under the Guaranty.

We sustain GPO and Eeds's first issue on cross-appeal.

**B.     TPG 2011-4's Attorney's Fees**

Our conclusion that the Construction Cost Overruns were not recoverable against GPO under the LLC Agreement disposes of the remaining issues—TPG 2011-4's eighth issue and GPO's third issue on cross-appeal—which concern the attorney's fees claimed by TPG 2011-4 related to its claim for breach of the LLC Agreement.

More specifically, in its eighth issue, TPG 2011-4 argues that the trial court erred in refusing to award it attorney's fees against Eeds under section 8.6 of the Guaranty because section 8.6 provided that Eeds would pay all "reasonable attorney's fees . . . reasonably incurred in any effort to enforce any term of th[e] Guaranty." But as acknowledged by TPG 2011-4, "to enforce the Guaranty against Eeds, [it] had to establish *both* GPO's underlying liability under the [LLC] Agreement *and* Eeds's liability under the Guaranty." This, TPG 2011-4 has not done. For the reasons we have stated, we conclude that TPG 2011-4 should not have prevailed on its claim for Construction Cost Overruns against either GPO or Eeds, and it thus should not have recovered any associated attorney's fees against Eeds.

We overrule TPG 2011-4's eighth issue.

70

Relatedly, in GPO's third issue on cross-appeal, GPO contends that TPG 2011-4 also should not recover attorney's fees against GPO "since GPO should not have been held liable for any [Construction Cost Overruns] under the [LLC] Agreement." Again, for the reasons we have stated, TPG 2011-4 should not have prevailed on its claim for Construction Cost Overruns against either GPO or Eeds, and thus, we conclude that it should not have recovered any associated attorney's fees against GPO.

We sustain GPO's third issue on cross-appeal.

## Conclusion

We reverse the part of the trial court's judgment in favor of GMFB against TPG Owner on the competing claims for breach of the Construction Contract, and we remand to the trial court both TPG Owner's and GMFB's claims for breach of the Construction Contract for a new trial.

We also reverse the part of the trial court's judgment in favor of TPG 2011-4 against GPO on TPG 2011-4's claim for breach of the LLC Agreement and against Eeds on TPG 2011-4's claim for breach of the Guaranty, and we render judgment that TPG 2011-4 shall take nothing under the LLC Agreement against GPO or under

the Guaranty against Eeds.  We affirm the remainder of the trial court's judgment that GPO shall take nothing under the LLC Agreement.

Julie Countiss
Justice

Panel consists of Justices Goodman, Hightower, and Countiss.

Justice Goodman, dissenting.